DUANE K. THOMPSON
BRIAN FITZSIMONS
APPLICATIONS PURSUANT TO LR IA 11-3 PENDING
Securities and Exchange Commission
100 F Street NE
Washington, D.C. 20549
202/551-7159
thhompsond@sec.gov

*Counsel for Plaintiff*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,**<br><br>    **Plaintiff,**<br><br>  **v.**<br><br>**LORAL L. LANGEMEIER and LIVE OUT LOUD, INC.,**<br><br>    **Defendants.** | 22-CV-_____<br><br><br>**COMPLAINT**<br><br><br>**JURY TRIAL DEMANDED** |

   Plaintiff Securities and Exchange Commission ("Commission" or "SEC"), for its Complaint against Loral L. Langemeier ("Langemeier") and Live Out Loud, Inc. ("LOL") (collectively, "Defendants"), alleges as follows:

## SUMMARY

   1.  This case involves two unregistered broker-dealers, Langemeier and her company LOL, who actively participated in the offer and sale of unregistered securities and then betrayed the trust of their clients. They did so by failing to disclose material conflicts of interest when recommending risky alternative investments. Specifically, Defendants failed to disclose that they were receiving undisclosed sales commissions based on those recommendations, and had other financial interests.

2.      From at least January 1, 2016 through December 31, 2018 (the "Relevant Period"), Langemeier held herself out as a sophisticated financial expert and mentor, and, through LOL, developed a roster of clients in Nevada and elsewhere who paid substantial fees in exchange for her supposedly objective business and financial advice.  Their client base consisted of small business owners, retirees, and other retail investors who typically held funds in retirement accounts that restricted their ability to invest in alternative investment schemes.  By her acts, Langemeier, through her company, assumed the role of an investment adviser to her clients.

3.      Langemeier convinced many of her clients to liquidate relatively conservative investments so that they could reinvest the money in risky and unregistered oil and gas offerings (the "Oil and Gas Securities"), which she enthusiastically recommended to clients at investment seminars and in aggressive follow-up solicitations.  In exchange, the sponsors of the Oil and Gas Securities paid Langemeier large sales commissions, which she never disclosed.  The Oil and Gas Securities were a series of unregistered securities offerings sponsored by Resolute Capital Partners, LLC ("RCP") and Homebound Resources, LLC ("Homebound").

4.      Langemeier arranged for RCP and Homebound's representatives to appear as guest speakers at LOL seminars to promote their particular Oil and Gas Securities.  Langemeier bolstered the presentations by portraying the oil and gas ventures as low-risk and tax advantaged vehicles to grow wealth.   She also touted her own supposed past success with similar investments.  While steering clients to RCP and Homebound, however, Defendants never disclosed to their clients that Langemeier had deep ties with both RCP and Homebound and was acting as a *de facto* unregistered broker on their behalf.

5.      Langemeier presented RCP and Homebound to her clients as unrelated third parties, when in reality she stood to profit in two separate – and undisclosed – ways when her clients purchased the Oil and Gas Securities.  First, Langemeier took undisclosed commissions of up to

10% on sales to clients she steered to RCP and Homebound. She received a total of approximately $407,807 in such commissions based on the more than $7.4 million of RCP/Homebound securities her clients purchased. Second, Langemeier held equity stakes in two of the investment vehicles she recommended to clients, HBR VI and SEA III, which were sponsored by RCP and Homebound. Langemeier ultimately received a payout worth approximately $279,854 by virtue of that ownership stake.

6.      Langemeier's commission arrangement with RCP and Homebound and her equity stake in the Oil and Gas Securities investment vehicles was material information that would be significant to a reasonable investor in assessing her recommendation. Moreover, Defendants knew or should have known that these conflicts of interest were material. Thus, they had a fiduciary duty to disclose conflicts to clients and to act in their best interest. They breached their fiduciary duty to clients by failing to disclose their material conflicts.

7.      During the Relevant Period, Defendants acted as unregistered brokers via their agreements with RCP and Homebound. By actively soliciting their clients to purchase the Oil and Gas Securities, they engaged in the business of effecting transactions in securities for others. They provided advice on the merits of the offerings and received transaction-based compensation in the form of undisclosed sales commissions from RCP and Homebound.

8.      Many of Defendants' clients suffered significant losses from these investments. The issuers of the Oil and Gas Securities failed to make distributions of profits to equity investors, stopped making regular interest payments on debt instruments, and/or refused to return principal when promissory notes sold to investors came due. In fact, one client lost nearly $1,000,000, which Defendants had convinced him to invest in the Oil and Gas Securities. The issuers even conditioned partial returns of principal to investors on signing non-disclosure agreements.

9.     Defendants violated the federal securities laws in three ways by: (i) acting as broker in the offer and sale of the Oil and Gas Securities despite not being registered with the Commission; (ii) actively participating in the offer and sale of unregistered securities; and (iii) failing to disclose material conflicts of interest while acting as investment advisers.

## VIOLATIONS AND RELIEF SOUGHT

10.     Through the conduct alleged in this Complaint, Defendants violated Section 15(a) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78o(a)], Sections 5(a) and 5(c) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77e(a) and (c)], and Section 206(2) of the Investment Advisers Act of 1940 ("Advisers Act") [15 U.S.C. § 80b-6(2)].

11.     The Commission seeks a final judgment from this Court: (1) permanently enjoining Defendants from future violations of Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)], Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. § 77e(a) and (c)], and Section 206(2) of the Advisers Act [15 U.S.C. § 80b-6(2)]; (2) permanently restraining and enjoining Langemeier, or any entities she controls, from (i) participating in the issuance, purchase, offer, or sale of any security, or (ii) engaging in activities for purposes of inducing or attempting to induce the purchase or sale of any security; provided, however, that she not be prevented from purchasing or selling securities listed on a national securities exchange for her own personal account; (3) ordering Defendants to disgorge their ill-gotten gains, together with prejudgment interest thereon; and (4) ordering Defendants to pay civil money penalties pursuant to Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)], Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)], and Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9(e)].

**JURISDICTION AND VENUE**

12.    The Commission brings this action pursuant to Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)], Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)], and Section 209(d) of the Advisers Act [15 U.S.C. § 80b-9(d)].

13.    This Court has jurisdiction over this action pursuant to Sections 21(d) and 27 of the Exchange Act [15 U.S.C. §§ 78u(d) and 78aa], Sections 20(d) and 22(a) of the Securities Act [15 U.S.C. §§ 77t(d) and 77v(a)], and Sections 209(d), 209(e) and 214(a) of the Advisers Act [15 U.S.C. §§ 80b-9(d), 80b-9(e) and 80b-14(a)].

14.    Defendants, directly or indirectly, have made use of the means or instruments of transportation or communication in interstate commerce, or of a means or instrumentality of interstate commerce, or of the mails, in connection with the transactions, acts, practices, and courses of business alleged in this Complaint.  Among other things, Defendants sent emails to clients around the country advertising LOL seminars and the Oil and Gas Securities, and engaged in interstate emails and telephone calls with RCP personnel regarding their sales and commissions.

15.    Venue lies in this District pursuant to Section 22(a) of the Securities Act, [15 U.S.C. §77v (a)], Section 27 of the Exchange Act [15 U.S.C. S78aa (a)], and Section 214 of the Advisers Act [15 U.S.C. §80b-14] because Defendants have transacted business here, including certain of the acts complained of in this Complaint, and because Defendants maintain a principal place of business in Zephyr Cove, Nevada.

16.    Defendants and the Commission executed three successive tolling agreements that collectively tolled the running of any applicable statute of limitation deadline from May 1, 2021 to July 1, 2022.

**DEFENDANTS**

17.    **Langemeier**, age 56, resides in Gardnerville, Nevada.  During the Relevant Period, Langemeier was engaged in the business of advising clients on business, finance and investing. Langemeier purported to explain strategies to grow wealth through investments in "alternative assets" and other investment strategies.  Langemeier was the sole owner and operator of LOL during the Relevant Period.   Langemeier has never been registered as a broker-dealer with the Commission or any state regulator.  Langemeier has not been associated with a registered broker-dealer since 2006.

18.    **LOL** is a Nevada limited liability company organized in 2001 and located in Zephyr Cove, Nevada.  During the Relevant Period, LOL was engaged in the business of advising clients on business, finance and investing.  LOL has never been registered with the Commission or any state securities regulator in any capacity.

**OTHER RELEVANT ENTITIES AND PERSONS**

19.    **Homebound** is a Texas company located in Irving, Texas.  Homebound acted as a project sponsor for RCP's offerings and was responsible for identifying and purchasing the oil and gas wells in which the RCP investment vehicles owned working interests.

20.    **RCP** is a Nevada company with offices in Texas, California and Minnesota.  RCP created numerous oil and gas debt and equity investment vehicles using wells identified by Homebound and its affiliates.

21.    **Thomas Joseph Powell ("Powell")**, age 53, is a resident of Reno, Nevada.  Powell is the owner of RCP and other related entities, and served as the Senior Managing Partner of RCP.

22.    **Stefan Tiberiu Toth ("Toth")**, age 48, is a resident of Frisco, Texas.  Toth is the founder, co-owner, Chairman and Chief Executive Officer of Homebound Financial Group, LP, and also operates and controls its subsidiaries, including Homebound.

23. A recent Commission Order found that Homebound, RCP, Powell, and Toth violated registration and anti-fraud provisions of the federal securities laws. *See In the Matter of Resolute Capital Partners, Ltd, LLC, et al.*, AP File No. 3-20597 (Sept. 24, 2021) (the "Homebound Commission Order"). In particular, the Homebound Commission Order found that that their offering disclosures were inadequate and that they made materially misleading statements in marketing the Oil and Gas Securities. The misleading statements included insufficiently supported oil production projections, assertions about potential tax benefits that were unavailable to certain investors, and incomplete disclosures about potential uses of investor funds, including the amount of funds that would be used for payments to prior debt and equity investors.

24. Powell, RCP, Toth, and Homebound reached settlements with the Commission in the Homebound Commission Order, which found that they violated Sections 5(a) and (c) and 17(a)(2) and (a)(3) of the Securities Act and Section 15(a) of the Exchange Act.

<u>**FACTS**</u>

**I.    <u>Defendants Marketed Business and Financial Advisory Services to a Large Client Base</u>**

25. During the Relevant Period, Langemeier held herself out as a highly successful business and finance expert. The LOL website touted Langemeier as "one of only a handful of women in the world today who can claim the title of 'Expert' when it comes to financial matters and the making of millionaires." Langemeier authored and made available to clients a number of e-books, including one titled "The Millionaire Maker" that purported to provide advice on tax and debt reduction strategies, credit repair and other financial topics. She also made frequent motivational speaking appearances at events sponsored by Mary Kay and other marketing organizations focused on small business or franchise owners. In frequent emails sent to LOL clients, Langemeier further promoted herself as an expert in investing, finance, and wealth creation.

26.     Through LOL, Langemeier offered clients several tiers of access to her advice and services.  Defendants offered a so-called "Fast Cash Coaching" service that promised small business owners expert advice on development strategies and financing techniques for a period of three months in exchange for a fee of $399.

27.     The next level of service Defendants offered was the "Big Table" service platform that promised unlimited lifetime business, financial and investment advice from Langemeier and other advisers at LOL for a one-time payment of between $2,000 and $30,000.

28.     The highest and most exclusive level of service Defendants offered was the "Head of the Table" platform that promised people who had already bought into the Big Table platform guaranteed lifetime access to Langemeier herself in exchange for an additional $25,000 payment.

29.     Langemeier advised at least one client to obtain a credit card to pay her $25,000 "Big Table" fee.  Defendants had an undisclosed agreement with the credit card provider pursuant to which they would earn a fee when LOL clients opened a credit card account.

30.     During the Relevant Period, Defendants had more than one hundred Big Table clients.  Many Big Table clients were actual or aspiring small business owners who had traditional retirement accounts such as 401(k) accounts through a current or former employer.

31.     Defendants promised Big Table clients an assortment of services "dedicated to the common goal of growing business [sic] and wealth by making money, investing money, keeping money" and at least one in-person session where "educational strategies on investments" would be taught.  Defendants purported to advise these clients on how to grow their wealth in a number of ways, including by investing in alternative assets and securities.  Defendants also invited Big Table clients to attend occasional webinars and seminars.

## II.    Defendants Acted as Unregistered Broker-Dealers

32.    During the Relevant Period, Defendants regularly participated at key points in the chain of distribution of the Oil and Gas Securities.  They actively marketed the Oil and Gas Securities to their network of clients, both individually and at investment seminars.  Defendants directed their clients to an RCP website where they could purchase the Oil and Gas Securities

33.    Langemeier also requested that RCP contact her clients directly to sell specific Oil and Gas Securities.  In return for steering clients to purchase the Oil and Gas Securities, Defendants received, pursuant to written agreements, transaction-based compensation in the form of sales commissions.

34.    In April 2016, Langemeier entered into a partnership agreement with Toth and Powell, who controlled Homebound and RCP respectively.  A related document stated that the purpose of the partnership was to "align the interests" of the parties," help "raise capital for the [oil and gas] funds largely through qualified plan funds (IRA/401k)" and "create a lead generation funnel for sourcing prospective investors in the United States and Canada."  The agreement entitled Langemeier to 10% commissions when her clients purchased the Oil and Gas Securities and 3% commissions if an investor came from LOL's "pool," but a different salesperson closed the deal.

35.    At seminars for Big Table clients and at other investment seminars during the Relevant Period, Defendants featured presentations on the Oil and Gas Securities and other "exclusive" investment opportunities.  Langemeier sent mass email messages to her client list to publicize upcoming presentations on the Oil and Gas Securities and encourage attendance.

36.    For example, on June 19, 2017, a member of the LOL staff, at Langemeier's direction, sent an email to LOL clients stating that "Loral and I have hand-picked you to be educated and/or involved in a special Gas & Oil Project that needs to be executed by June 30, 2017," and encouraged clients to "text Loral directly" for more details.

37.     Similarly, on January 18, 2018, Langemeier emailed LOL clients to promote her "team that guides you from beginning to end" and to encourage them to register for an online "Assets Blitz," where they would learn about, among other things, how to "[i]nvest more money in off-Wall Street opportunities such as gas & oil, real estate, promissory notes, securities, precious metals and franchises."

38.     At LOL seminars, Defendants introduced representatives of the issuers who proceeded to make presentations on the offerings.  In 2016 alone, for example, Thomas Powell presented at various monthly Big Table seminars held in Lake Tahoe, Nevada and San Diego, California, and presented at the "Ultimate Millionaire Summit" ("UMS") held in San Diego, California.  Below is the 2016 schedule that was emailed from LOL to presenters, including Powell and other representatives of RCP.

| Big Table | January 25-26 | Lake Tahoe, NV |
|---|---|---|
| Big Table | February 22-23 | Lake Tahoe, NV |
| Big Table | March 21-22 | Lake Tahoe, NV |
| Big Table | April 25-26 | Lake Tahoe, NV |
| Big Table | May 23-24 | Lake Tahoe, NV |
| Big Table | June 13-14 | Lake Tahoe, NV |
| Big Table | July 18-19 | Lake Tahoe, NV |
| Big Table | August 22-23 | Lake Tahoe, NV |
| Big Table | September 19-20 | Lake Tahoe, NV |
| Big Table | October 25-26 | San Diego, CA |
| Big Table | November 14-15 | Lake Tahoe, NV |
| Big Table | December 5-6 | Lake Tahoe, NV |
| UMS | October 26-29 | San Diego, CA |

39.     Langemeier endorsed the Oil and Gas Securities to the client audience attending LOL investment seminars.  Langemeier had a standard "talk track" that she used with clients when selling the Oil and Gas Securities.  This was a pitch script that included a story about how she made her "first million" in oil and gas, and how RCP's multi-well projects are great investments that have "blended returns," (referring to distributions from the sale of oil from multiple wells) which are

10

safer and reduce risk.  She also claimed to have achieved personal wealth through her own previous investments in oil and gas ventures.

40.      Langemeier knew that traditional retirement accounts such as employer-sponsored 401(k) plans and IRAs, in which her clients typically held their available funds, did not permit withdrawals to fund the purchase of alternative investments.  Langemeier therefore advised clients to transfer funds to self-directed IRAs so that they could act on her recommendations to purchase Oil and Gas Securities.  Langemeier encouraged such conversions by describing purported tax and other benefits of oil and gas investing.  Many clients liquidated funds that they had previously invested in more traditional retirement accounts in order to fund purchases of the Oil and Gas Securities through newly-opened self-directed IRAs.

41.      Langemeier directed interested clients to an RCP website where they could complete investment paperwork for Oil and Gas Securities.  Langemeier received monthly commission tracking spreadsheets, which detailed the commissions she was due when her clients invested in the Oil and Gas Securities.  For example, in late June 2016, Defendants received a "LOL (HBR VI) Tracker" which listed the names of investors, amounts, and commissions for LOL clients who purchased the Oil and Gas Securities.  An excerpt appears below (investor names not provided):

| HBR VI, LLC 2016 | | | | | | | |
|---|---|---|---|---|---|---|---|
| **ISD INVESTOR NAME** | DATE | LEAD SOURCES | DEBT INVESTED | EQUITY INVESTED | TOTAL MARKETING 14% | MARKETING PAID 10% | DIFFERENCIAL 4% |
|  | 4/18/2016 | LOL | $ 26,000.00 | $    - | $ 3,640.00 | $ 2,600.00 | $ 1,040.00 |
|  | 4/18/2016 | LOL | $ 11,400.00 | $    - | $ 1,596.00 | $ 1,140.00 | $ 456.00 |
|  | 5/3/2016 | LOL | $ 10,000.00 |  | $ 1,400.00 | $ 1,000.00 | $ 400.00 |
|  | 4/29/2016 | LOL | $    - | $ 96,000.00 | $ 13,440.00 | $ 9,600.00 | $ 3,840.00 |
|  | 4/29/2016 | LOL | $    - | $ 12,800.00 | $ 1,792.00 | $ 1,280.00 | $ 512.00 |
|  | 5/5/2016 | LOL | $ 22,500.00 | $    - | $ 3,150.00 | $ 2,250.00 | $ 900.00 |
|  | 5/23/2016 | LOL | $ 65,500.00 |  | $ 9,170.00 | $ 6,550.00 | $ 2,620.00 |
|  | 5/24/2016 | LOL | $ 15,000.00 |  | $ 2,100.00 | $ 1,500.00 | $ 600.00 |
|  | 5/23/2016 | LOL | $    - | $ 22,500.00 | $ 3,150.00 | $ 2,250.00 | $ 900.00 |

42.      In addition to the presentations at LOL seminars, Langemeier sent messages to her clients using aggressive sales tactics to promote the Oil and Gas Securities and their purported

benefits.  For example, in a text message exchange in late June 2016, Langemeier warned one client that a particular RCP offering "[i]s closing soon . . . u will miss this huge one" and advised the client to "wire more . . . $100-250k."  Ten days later, when the client still had not invested, Langemeier urged her client to "Do the [RCP] deal.  Even if 100k."

43.    All told, Langemeier raised approximately $7.4 million in investor money for RCP and Homebound sponsored investments during the Relevant Period.  From 2016 to 2018, Langemeier, through LOL, received at least $407,807 in undisclosed commissions.

44.    LOL was not registered with the Commission as a broker-dealer at any time during the Relevant Period.  Langemeier was not registered with the Commission as an associated person of a broker-dealer at any time during the Relevant Period.

### III.    Defendants Were Active Participants in the Offer and Sale of Unregistered Securities

45.    The Oil and Gas Securities were offered in two forms: (1) membership interests in the oil and gas equity offerings that involved investors paying money to purchase membership interests with an expectation of regular dividends and profits upon the sale of the oil and gas wells; and (2) promissory notes offering fixed interest payments ranging between 8% to 12% and the return of capital upon expiration of the notes.

46.    The Oil and Gas Securities were "securities" within the meaning of Section 2(a)(1) of the Securities Act and Section 3(a)(10) of the Exchange Act. The equity offerings involved investors paying money to purchase membership interests, a common enterprise, and a reasonable expectation of profits based on the efforts of third parties who identified, acquired and drilled the wells.  The promissory notes were "notes" as included in the definition of "security" set forth in Section 2(a)(1) of the Securities Act.

47.    Defendant sold the Oil and Gas Securities to clients through the means and instrumentalities of interstate commerce.

48.    No registration statement was filed or in effect for any of the Oil and Gas Securities. No exemption from registration applied.

49.    Langemeier was an active participant in the offer and sale of the unregistered Oil and Gas Securities. LOL also was an active participant in the offer and sale of the unregistered Oil and Gas Securities. Throughout the Relevant Period, Defendants actively marketed the Oil and Gas Securities to their clients, and routinely directed clients to view marketing documents on RCP's website. Defendants directly marketed the Oil and Gas Securities to clients both in person and via marketing emails by describing the benefits of oil and gas investing, detailing Langemeier's previous oil and gas investments, promoting the details of the specific investment opportunities, and introducing LOL clients to the principals of RCP and Homebound for the purpose of selling them securities. Moreover, Defendants regularly provided clients with advice on ways to finance purchases of the Oil and Gas Securities. Defendants also regularly directed clients directly to RCP personnel or the website to view additional information and complete the sales.

50.    Defendants' contribution to the distribution of the Oil and Gas Securities was not *de minimis*. To the contrary, Defendants generated at least $7.4 million of sales to their customers.

**IV.    Through Their Actions, Defendants Acted as Investment Advisers**

51.    During the Relevant Period, Defendants were engaged in a business that included providing investment advice to clients. For example, Langemeier held herself out as an expert in wealth generation, and regularly provided investment advice in exchange for fees paid by clients. Langemeier and LOL provided such advice at LOL investment seminars and webinars, as well as via e-mail, phone and text communications.

52.    Although Defendants also provided generalized business and financial advice, they regularly gave specific investment advice to clients concerning the Oil and Gas Securities.

Defendants advised clients on the merits of the Oil and Gas Securities, supposed tax advantages, and ways to finance purchases.

53.    While Defendants steered their clients to the issuers of the Oil and Gas Securities to make actual purchases, they did not tell clients to consult any other investment advisor before purchasing. More than one-hundred clients accepted Defendants' advice and purchased Oil and Gas Securities.

54.    Defendants had clients attending the monthly Big Table seminars sign an agreement, which outlined services provided and contained disclaimers, including that services should not be construed as investment advice. The disclaimer was part of the registration process for clients who were already physically present at the seminar – some of whom had traveled thousands of miles and all of whom had committed significant monies to attend. Moreover, Defendants negated the disclaimer through their actions once the seminars started and after they concluded. Specifically, Defendants provided investment advice at the seminars as described above. Defendants' use of the boilerplate disclaimer was merely a transparent attempt to dodge their fiduciary responsibilities as investment advisers.

55.    Notwithstanding the purported disclaimers, Defendants acted as investment advisers. By assuming that role, Defendants were fiduciaries who had a legal and ethical obligation to act in their clients' best interest, to provide investment advice that was in their clients' best interest, and to exercise utmost good faith in dealing with their clients. This included the duty to their clients to disclose all material conflicts of interest.

1

2  **V.    Defendants had Material, Undisclosed Conflicts of Interest**

3       56.    As averred in Paragraph 34 above, Langemeier recommended the Oil and Gas

4  Securities to clients pursuant to partnership agreement with Toth and Powell.  The partnership

5  agreement and other documents state that she was entitled to receive up to a 10% commission on

6  sales she generated.  During the Relevant Period, Langemeier, pursuant to her partnership

7  agreement, received at least $407,807 in undisclosed commissions from Homebound.  Payments

8  were made to her pass through entity NV Huskers, LLC.

9

10      57.    In addition, Langemeier held undisclosed ownership interests in two of the issuers of

11  the Oil and Gas securities, entities called HBR VI and SEA III.  In April 2016, Langemeier, Powell,

12  Toth and two other individuals created an entity called Mountain High Capital ("MHC").  MHC

13  was the majority owner of HBR VI and SEA III, which entitled it to proceeds from any sale of the

14  issuers or any other capital transaction.  When HBR VI and SEA III were sold in August 2018 via a

15  related party transaction, each of the members of MHC, none of whom had invested any funds to

16  obtain their ownership stakes in MHC or the issuers, received distributions of $279,854.

17

18      58.    In marketing the Oil and Gas Securities to their clients, Defendants failed to disclose

19  the existence or terms of the partnership agreement among Langemeier, Toth, and Powell.

20  Defendants also did not disclose the fact that Langemeier was contractually entitled to receive

21  commissions based on sales of the Oil and Gas Securities.  Nor did Defendants disclose that

22  Langemeier was a part owner in some of the oil and gas ventures themselves.

23

24      59.    The information described in paragraphs 34, and 56 – 57 above was material.

25  Reasonable investors would have wanted to know that information, and would have found the

26  information significant, in determining whether to invest in the Oil and Gas Securities.

27

28

60.    Defendants knew or should have known that the facts averred in paragraphs 34 and 56 - 57 above would have been material to their clients in deciding whether to invest in the Oil and Gas Securities.  By failing to disclose those facts, Defendants were at least negligent and violated their fiduciary duty to their clients.

## FIRST CLAIM FOR RELIEF

### Violations of Exchange Act Section 15(a) of the Exchange Act

61.    The Commission re-alleges and incorporates by reference the allegations in paragraphs 1 through 60, inclusive, as if they were fully set forth herein.

62.    Langemeier and LOL, directly or indirectly, by the use of the mails or the means or instrumentalities of interstate commerce, while acting as or associated with a broker or dealer, effected transactions in, or induced or attempted to induce the purchase or sale of securities, while they were not registered with the Commission as a broker or dealer and while they were not associated with an entity registered with the Commission as a broker-dealer.

63.    By engaging in the conduct described above, Langemeier and LOL violated, and unless restrained and enjoined will in the future violate Section 15(a) of the Exchange Act, 15 U.S.C. § 78o(a).

## SECOND CLAIM FOR RELIEF

### Violations of Sections 5(a) and 5(c) of the Securities Act

64.    The Commission re-alleges and incorporates by reference the allegations in paragraphs 1 through 60, inclusive, as if they were fully set forth herein.

65.    By engaging in the acts and conduct alleged in this Complaint, Langemeier and LOL, directly or indirectly, have made use of the means or instruments of transportation or communication in interstate commerce or of the mails to sell or to offer to sell securities, when no registration statement was filed or in effect with the Commission as to such securities.

66.     No exemption from the registration requirement existed with respect to the securities and transactions described in this Complaint.

67.     By reason of the foregoing, Langemeier and LOL violated, and, unless enjoined, are reasonably likely to continue to violate, Sections 5(a) and 5(c) of the Securities Act, 15 U.S.C. § 77e(a) and (c).

### THIRD CLAIM FOR RELIEF

#### Violations of Section 206(2) of the Advisers Act

68.     The Commission re-alleges and incorporates by reference the allegations in paragraphs 1 through 60, inclusive, as if they were fully set forth herein.

69.     By engaging in the acts and conduct alleged in this Complaint, Langemeier and LOL were acting as an investment advisers to their clients within the meaning of Section 202(a)(11) of the Advisers Act, 15 U.S.C. § 80b-2(a)(11), because, for compensation, the engaged in the business of advising others, either directly or through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing, or selling securities.

70.     Langemeier and LOL, directly or indirectly, singularly or in concert, by use of the mails or means and instrumentalities of interstate commerce, while acting as investment advisers, engaged in transactions, practices, or courses of business which operated as a fraud or deceit upon any client or prospective client, with at least negligence.

71.     As investment advisers, Langemeier and LOL owed their clients a fiduciary duty of utmost good faith, undivided loyalty, and care to make full disclosure to them of all material facts, as well as the duty to act in their best interests, and not to act in their own interests to the detriment of their clients.

72.     Langemeier and LOL breached their fiduciary duties to their clients and engaged in fraudulent conduct by not disclosing their various conflicts of interest to their clients.

73.    By reason of the foregoing, Langemeier and LOL violated, and unless enjoined will again violate, Section 206(2) of the Advisers Act, 15 U.S.C. § 80b-6(2).

## **PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that this Court enter a final judgment:

A.    Permanently restraining and enjoining Defendants from, directly or indirectly, violating Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)]; Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. § 77e(a) and (c)]; and Section 206(2) of the Advisers Act [15 U.S.C. §§ 80b-6(2)].

B.    Permanently restraining and enjoining Langemeier, or any entities she controls, from (i) participating in the issuance, purchase, offer, or sale of any security, or (ii) engaging in activities for purposes of inducing or attempting to induce the purchase or sale of any security; provided, however, that she not be prevented from purchasing or selling securities listed on a national securities exchange for her own personal account

C.    Ordering Defendants to disgorge all funds received from their illegal conduct, together with prejudgment interest thereon;

D.    Ordering Defendants to pay civil penalties pursuant to Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9(e)], Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)], Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)]; and

E.    Granting such other and further relief as this Court may deem just, equitable, or necessary in connection with the enforcement of the federal securities laws and for the protection of investors

1  Dated: June 15, 2022

2                                          Respectfully submitted,

3                                          */s/ Duane K Thompson*
4  Of Counsel:                             Duane K. Thompson*
   Brian Vann                              Brian Fitzsimons*
5  Securities and Exchange Commission      Securities and Exchange Commission
   100 F Street, NE                        100 F Street NE
6  Washington, D.C. 20549                  Washington, D.C. 20549
                                           Tele: 202/551-7159 (Thompson)
7                                          thompsond@sec.gov

8  *Application pursuant to LR IA 11-3 to appear for an agency of the United States pending

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28