1
2
3
4
5
6

UNITED STATES DISTRICT COURT

7

DISTRICT OF NEVADA

8

* * *

9
10

SECURITIES AND EXCHANGE
COMMISSION,

Case No. 3:22-cv-00269-LRH-CSD

ORDER

11

Plaintiff,

12

v.

13

LORAL L. LANGEMEIER and
LIVE OUT LOUD, INC.,

14

Defendants.

15

16          Before the Court are cross motions for summary judgment. First, Plaintiff Securities and

17    Exchange Commission (the "SEC") filed a motion for partial summary judgment. ECF No. 27.

18    Defendants Loral L. Langemeier ("Langemeier") and Live Out Loud, Inc. ("LOL") (collectively,

19    "Defendants") filed a response in opposition to the motion (ECF No. 35) and the SEC replied (ECF

20    No. 38). Defendants also filed a motion for summary judgment. ECF No. 28. The SEC filed a

21    response in opposition to the motion (ECF No. 36) and Defendants replied (ECF No. 37). For the

22    reasons articulated herein, the Court grants the SEC's motion and denies Defendants' motion.

23    **I.      BACKGROUND**

24          This matter arises out of the sales of unregistered oil and gas securities that occurred from

25    January 1, 2016, through December 31, 2018 (the "Relevant Period").

26          **A.      Langemeier and LOL**

27          Langemeier is a best-selling author and founder of LOL, a corporation dedicated to helping

28    individuals become financially literate. ECF No. 13 at 1, 2; ECF No. 28 at 2. In Langemeier's own

1

words, she mentors families and businesses on how to make money. ECF No. 27-49 at 18. LOL clients pay different tuition fees for membership in different tiered LOL programs all of which come with varying access levels to Langemeier's financial education services. ECF No. 13 at 8. The tiers include the "Fast Cash Coaching" program, the "Big Table" program, and the "Head of the Table" program. *Id*. The Big Table program includes unlimited lifetime access to education, coaching, and LOL-events and resources. *Id*. The Head of the Table program is more exclusive and offers everything included in the Big Table program plus one-on-one financial coaching with Langemeier. *Id*. Relevant here are two types of educational seminar events that LOL-hosted for its clients: "Big Table" events at which subject matter professionals were invited to speak about their expertise and experiences, and a one-time "Ultimate Millionaire Summit" event, a massive educational coaching seminar in Lake Tahoe. *Id*. at 37; ECF No. 27-49 at 76, 180–81. Langemeier and LOL hosted multiple Big Table events and the singular Ultimate Millionaire Summit during the Relevant Period. ECF No. 27-13 at 2. Of Langemeier and LOL's employees, two are pertinent in this litigation: Kris Chandler, Langemeier's Personal and Executive Assistant, and Damon Stokes, a Big Table Program Manager who oversaw LOL's coaching programs and acted as a client-liaison. ECF No. 29-2 at 5, 6; ECF No. 29-1 at 6–9.

**B.      Langemeier and the Mountain High Capital Partnership**

Near the beginning of the Relevant Period on April 25, 2016, Langemeier became a partner-owner in Mountain High Capital ("MHC") alongside Thomas Powell, Stefan Toth, Ben Williams, and Lee Jones. *See* ECF No. 27-5; *see also* ECF No. 29-11. The five partner-owners formed MHC with the goal of providing alternative investment education and opportunities to a diverse group of clients. ECF No. 27-5 at 2. Thomas Powell ("Powell") is the founder and was Senior Managing Partner of Resolute Capital Partners Ltd., LLC ("RCP"), a private equity group that raised funding for certain alternative investments including the oil and gas projects at issue here. ECF No. 29-8 at 4; ECF No. 27-40 at 7. Stefan Toth ("Toth") was the Chairman and Chief Executive Officer of Homebound Resources, LLC ("HR"), a Texas-based company involved in the production, development, and management of oil and gas projects including the ones for which RCP raised funds. ECF No. 29-8 at 4 n.5; ECF No. 27-40 at 4, 6. Ben Williams ("Williams") and

Lee Jones ("Jones") were the operating managers for iSelf-Direct LLC ("iSD"), a company that assisted potential investors in opening self-directed retirement accounts which they could use to purchase securities in the oil and gas projects managed by HR and funded by RCP. ECF No. 29-8 at 5; ECF No. 29-3 at 15.

Amongst others, one objective of MHC was to create a lead generation funnel for sourcing prospective investors. ECF No. 27-4 at 2. MHC partner-owners generally understood that Langemeier was to be the primary source of prospective investor lead generation via her LOL-client base attending Big Table and Ultimate Millionaire Summit events. *See* ECF No. 27-49 at 118– 20; *see also* ECF No. 27-51 at 21–44. The framework under which MHC partner-owners were to be compensated when they brought an investor into a project was clearly outlined in the Mountain High Capital Partnership Agreement ("MHCPA"): "[p]artners who bring a commission to the company earn a fee/percentage fair to the deal." ECF No. 27-5 at 2. Under the MHCPA, the "originating source of the investor earn[ed] up to a 10% fee." *Id*. The MHCPA further contemplated a framework for payments where an investor originated with Langemeier and LOL but then used iSD's services to open a self-directed retirement account for making a final purchase: "LOL receive[d] 3% and [iSD] receive[d] 7%." *Id*. Outside of the MHCPA, Langemeier and iSD executed the Referral Marketing Agreement under which Langemeier was to be compensated for referring clients to use iSD's self-directed retirement plan service and administration services. *See* ECF No. 27-6; *see also* ECF No. 29-12.

### C.   Mountain High Capital Partner-Owners Present to LOL-clients on Oil and Gas at LOL-hosted Events

Throughout the Relevant Period, Langemeier invited Powell, Toth, Williams, Lee, and others to present as experts on the alternative investment topic of oil and gas at Big Table events and the one-time Ultimate Millionaire Summit. ECF No. 13 at 3, 9; ECF No. 27-49 at 132. If event attendees were interested in learning more about the subject matter an invited expert presented on, the attendee provided their personal information on a sign-up sheet that was then forwarded to the presenter or the presenter's company in some capacity. ECF No. 29-1 at 12, 15; ECF No. 29-8 at 5, 6, 25. Several LOL clients signed up and were subsequently linked to the presenting experts and

their companies. *Id*. This resulted in many LOL-clients purchasing the oil and gas securities offered by the Langemeier's presenting experts. ECF No. 27-45. Majorly at issue here is Defendants' conduct, participation, and role in the purchases of the oil and gas securities made by LOL-clients from the experts and their companies.

Importantly in the last year of the Relevant Period, Langemeier and Toth executed an additional agreement entitled the Marketing Engagement Agreement ("MEA"). ECF No. 27-7. The MEA was between HR and NV Huskers—a business entity that received payments on behalf of Langemeier and LOL throughout the Relevant Period (ECF No. 29-5 at 58, 59; ECF No. 29-3 at 25)—under which HR agreed to pay NV Huskers a set-monthly retainer fee of $25,000 in exchange for prospective oil and gas project investor introductions at LOL events.[1] *Id*.

**D.    The SEC Investigates and Files its Complaint Against Langemeier and LOL**

After conducting an internal investigation, staff of the SEC made a preliminary determination and recommendation to file an enforcement against Langemeier and LOL for their involvement in the oil and gas securities sales scheme. *See generally* ECF No. 29-7. After receiving the SEC's Wells Notice, Defendants denied involvement in the scheme and requested that the SEC refrain from bringing charges. *See generally* ECF No. 29-8. On June 15, 2022, the SEC filed a civil complaint against Langemeier and LOL for acting as unregistered brokers who actively participated in the offer and sale of unregistered oil and gas securities while failing to disclose material conflicts of interest to clients. ECF No. 1 at 1. In its complaint, the SEC specifically alleges that Langemeier and LOL (1) violated Section 15(a) of the Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78o(a), by, directly or indirectly, using interstate commerce to induce the purchase of or sell securities while she was not registered with the SEC as a broker nor associated with a registered entity; (2) violated Sections 5(a) and 5(c) of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. § 77e(a) and 77e(c), by, directly or indirectly, using interstate commerce to sell or offer to sell securities when no registration statement was filed or in effect

---

[1]    The MEA was executed by Toth and Langemeier on March 28, 2018. ECF No. 27-7 at 5. The agreement was backdated by Langemeier to be effective as of January 1, 2018. *Id*. Either way, the MEA was in effect over a substantial portion of 2018 and, by extension, of the Relevant Period.

with the SEC as to those securities; and (3) violated Section 206(2) of the Investment Advisers Act of 1940 (the "Advisers Act"), 15 U.S.C. § 80(b)–6(2), breached their client-owed fiduciary duties and engaged in fraudulent conduct by not disclosing various conflicts of interest to their clients while acting as investment advisers. *Id.* at 16, 17.

Notably, but in no way determinative of the issues presented in this litigation, Powell, Toth, RCP, and HR reached a settlement with the SEC in which they admitted to violating Section 15(a) of the Exchange Act and Sections 5(a), 5(c), 17(a)(2) and 17(a)(3) of the Securities Act for their participation in the oil and gas securities scheme. *See In the Matter of Resolute Capital Partners, Ltd., LLC, et al.*, AP File No. 3-20597 (Sept. 24, 2021). On May 15, 2023, the SEC filed its motion for partial summary judgment. ECF No. 27. That same day, Defendants filed their motion for summary judgement. ECF No. 28. The motions are addressed below.

## II.      LEGAL STANDARD

Summary judgment is appropriate only when the pleadings, depositions, answers to interrogatories, affidavits or declarations, stipulations, admissions, and other materials in the record show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In assessing a motion for summary judgment, the evidence, together with all inferences that can reasonably be drawn therefrom, must be read in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *County of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1154 (9th Cir. 2001).

The moving party bears the initial burden of informing the court of the basis for its motion, along with evidence showing the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). On those issues for which it bears the burden of proof, the moving party must make a showing that is "sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party." *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986) (quoting W. Schwarzer, *Summary Judgment Under the Federal Rules: Defining Genuine Issues of Material Fact*, 99 F.R.D. 465, 487-88 (1984)); *see also Idema v. Dreamworks, Inc.*, 162 F.Supp.2d 1129, 1141 (C.D. Cal. 2001).

To successfully rebut a motion for summary judgment, the nonmoving party must point to facts supported by the record which demonstrate a genuine issue of material fact. *Reese v. Jefferson Sch. Dist. No. 14J*, 208 F.3d 736, 738 (9th Cir. 2000). A "material fact" is a fact "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Where reasonable minds could differ on the material facts at issue, summary judgment is not appropriate. *See v. Durang*, 711 F.2d 141, 143 (9th Cir. 1983). A dispute regarding a material fact is considered genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Liberty Lobby*, 477 U.S. at 248. "The mere existence of a scintilla of evidence in support of the [party's] position [is] insufficient" to establish a genuine dispute; "there must be evidence on which the jury could reasonably find for the [party]." *Id.* at 252. "A moving party without the ultimate burden of persuasion at trial … has both the initial burden of production and the ultimate burden of persuasion on a motion for summary judgment." *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000). "In order to carry its burden of production, the moving party must produce either evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Id*.

## III.   DISCUSSION

In evaluating cross motions for summary judgment, the Court "must consider each party's evidence, regardless under which motion the evidence is offered." *Las Vegas Sands, LLC v. Nehme*, 632 F.3d 526, 532 (9th Cir. 2011); *see also Fair Hous. Council of Riverside Cnty., Inc. v. Riverside Two*, 249 F.3d 1132, 1134 (9th Cir. 2001) ("[T]he court must consider the appropriate evidentiary material identified and submitted in support of both motions, and in opposition to both motions, before ruling on each of them"). Furthermore, the Court must consider each motion "on its own merits" to determine whether any genuine issue of material fact exists. *Riverside Two*, 249 F.3d at 1136. While the Court considers each motion separately and on its own merits, the parties offer nearly identical arguments in support of their respective motions and in response to the opposing party's motion. For this reason, the Court's written analysis of the motions is combined.

///

**A. The Court grants the SEC's motion for partial summary judgment (ECF No. 27) as to its first, second, and third causes of action. The Court denies Defendants' motion for summary judgment (ECF No. 28) as to those same causes of action.**

In summary, the SEC argues that Langemeier and LOL be found liable for violating the following federal securities laws: (1) Section 15(a) of the Exchange Act; (2) Sections 5(a) and 5(c) of the Securities Act; and (3) Section 206(2) of the Advisers Act. ECF No. 27 at 2. Importantly, the SEC's motion does not seek judgment as to remedies for the alleged violations. *Id*. at n.1. Instead, the SEC asks the Court to grant its pending motion and then allow it to file a separate motion seeking judgment as to remedies. *Id*. In their motion, Defendants argue that they are entitled to summary judgment on each of the alleged violations because the uncontroverted evidentiary record shows that Defendants are educators who never required any securities related licenses or registrations and who never offered to sell or sold the oil and gas securities. ECF No. 28 at 2. Defendants contend that they do not belong in this litigation and were "overzealously swept" into the woes of related parties following SEC-led investigations. *Id*. Below, the Court addresses each alleged cause of action raised as raised in the SEC's motion as well as Defendants' responses and arguments in support of its own motion.

      1.    There is no genuine issue that Defendants effected transactions of the oil and gas securities using interstate commerce while they were not registered as brokers with the SEC. Therefore, the Court grants the SEC's motion and denies Defendants' motion as to the SEC's first alleged cause of action for a Section 15(a) Exchange Act violation.

The SEC seeks summary judgment on its first cause of action that Defendants violated Section 15(a) of the Exchange Act by acting as securities brokers without being registered with the SEC. ECF No. 27 at 2. Defendants also seek summary judgment on this cause of action, arguing that they are educators, not securities brokers. ECF No. 28 at 18, 19. Section 15(a) of the Exchange Act makes it "unlawful for any broker … to make use of the mails or any means or instrumentality of interstate commerce to effect any transactions in, or to induce or attempt to induce the purchase or sale of, any security … unless that broker … is registered" with the SEC. 15 U.S.C. § 78o(a)(1). A "broker" is "any person engaged in the business of effecting transactions in securities for the account of others." 15 U.S.C. § 78c(a)(4)(A). The broker-registration requirement ensures that

"securities are [only] sold by a salesman who understands and appreciates both the nature of the securities he sells and his responsibilities to the investor to whom he sells." *Sec. & Exch. Comm'n v. Hui Feng*, Case No. 15-CV-09420, 2017 WL 6551107, at \*6 (C.D. Cal. Aug. 10, 2017) (citation omitted).

Recently, the Ninth Circuit stated that courts generally employ a "totality-of-the-circumstances" approach and rely on the "*Hansen* factors" to determine whether a defendant is a broker.[2] *U.S. Sec. & Exch. Comm'n v. Murphy*, 50 F.4th 832, 843 (9th Cir. 2022) ("*Murphy II*"). However, in *Murphy II* the Ninth Circuit did not take that approach and instead analyzed the statutory definition of "broker" against the defendants' conduct to affirm the district court's finding that defendants acted as unregistered brokers in a set of securities transactions. *Id*. at 843–45. Here, Defendants claim that *Murphy II* cautions district courts not to use the *Hansen* factors when determining a defendant's status as a broker. ECF No. 35 at 12. While the Ninth Circuit did not explicitly rely on the *Hansen* factors in reaching its holding in *Murphy II*, it reasoned that at least some *Hansen* factors were present and supported its finding. *Murphy II*, 50 F.4th at 846. The Court then finds no reason to depart from the common Ninth Circuit practice of taking a totality-of-the-circumstances approach and applying the *Hansen* factors to determine whether Defendants acted as brokers, a practice that *Murphy II* specifically acknowledged and did not reject. Moreover, district courts in the Ninth Circuit have continued to take this approach even post-*Murphy II*. *See, e.g.*, *Sec. & Exch. Comm'n v. Armijo*, Case No. 21-CV-1107 TWR (RBB), 2023 WL 2436963, at \*11, 12 (S.D. Cal. Mar. 8, 2023).

The *Hansen* factors are non-exclusive and often result in a fairly fact intensive and broad test for determining whether a defendant acted as a broker. *Murphy II*, 50 F.4th at 842–43 (citation and quotation omitted). The *Hansen* factors include, but are not limited to, whether the defendant (1) is an employee of the issuer; (2) received commissions as opposed to salary; (3) is selling, or previously sold, the securities of other issuers; (4) was involved in negotiations between the issuer

---

[2]  The *Hansen* factors are derived from *SEC v. Hansen*, Case No. 83 Civ. 3692, 1984 WL 2413, at \*10 (S.D.N.Y. Apr. 6, 1984).

and the investor; (5) made valuations as to the merits of the investment or gives advice; and (6) is an active rather than passive finder of investors. *Hansen*, 1984 WL 2413, at *10 (citation omitted).

By way of example, a district court in the Ninth Circuit used the *Hansen* factors to find that the defendants in that case acted as brokers and were subject to Section 15(a)'s broker-registration requirement. *See Hui Feng*, 2017 WL 6551107, at *7–9. The district court reasoned that the defendants were brokers because they received transaction-based commissions or referral fees, actively found investors, negotiated between issuers and investors, gave advice regarding investments, and recommended investments to clients. *Id.* at 8. In affirming the district court's decision, the Ninth Circuit reasoned that the presence of many *Hansen* factors showed, as a matter of law, that the defendant was "engaged in the business of effecting transactions in securities for the account of others" and, as such, was "required to register with the SEC as a broker." *U.S. Sec. & Exch. Comm'n v. Hui Feng*, 935 F.3d 721, 731–34 (9th Cir. 2019) (citation omitted).

The SEC argues that the *Hansen* factors show that Defendants acted as brokers of the oil and gas securities transactions to LOL clients. ECF No. 27 at 23–25. Moreover, the SEC argues summary judgment is appropriate here because Defendants (1) conducted interstate activity; (2) effected transactions in or attempted to induce the purchase of the oil and gas securities; and (3) admitted they were not registered brokers. *Id*. at 25. Defendants do not dispute that they conducted interstate activity or that they were un-registered, but instead argue that they never held themselves out to be brokers, never acted as brokers, and are not in the business of effecting securities transactions for the account of others. ECF No. 28 at 17; ECF No. 35 at 8, 14. Instead, Defendants argue that they are long-standing *bona fide* Financial Education and Coaching ("FEC") event hosts who are engaged in the business of educating LOL-clients. ECF No. 35 at 8, 14.

The Court has carefully considered the record in this matter and finds that Defendants acted as brokers and are subject to Section 15(a)'s broker-registration requirement. The totality-of-the-circumstances, as guided by the *Hansen* factors, shows that Defendants were engaged in the business of effecting oil and gas securities transactions for the account of LOL-clients. Defendants have offered no evidence creating genuine dispute as to whether they effected, induced, or attempted to induce their clients to purchase the oil and gas securities through interstate commerce.

The first *Hansen* factor is the only factor weighing in favor of Defendants not being considered brokers. The record undisputedly shows that Langemeier was not an employee of any issuer here. While the evidence does establish that she was a partner with issuer-related parties in MHC, an arms-length relatedness is not what the first *Hansen* factor demands. Even Langemeier's admission that she was essentially an "admin assistant" for Powell does not conclusively demonstrate that she was an employee of RCP or any issuer in this scheme.

All remaining *Hansen* factors favor Defendants being considered brokers. As compensation, Defendants claim that Langemeier received reimbursement expenses and marketing fees, not transaction-based or success-based compensation like commissions. No. 28 at 17, 18; ECF No. 35 at 8, 9. While the record contains evidence supporting the theory that Defendants received reimbursements and marketing-fees,[3] such evidence does not create genuine issue as to whether Defendants additionally or ever received transaction-based compensation like commissions. The MHCPA clearly outlined a commission-styled payment framework under which partners were to be paid when they brought an investor into a project. ECF No. 27-5 at 2 (the "originating source of the investor earns up to a 10% fee" and "[i]f an investor comes from the LOL pool and is closed by [iSD], LOL receives 3% and [iSD] receives 7%"). In her deposition, Langemeier testified that she understood the compensation she was to receive at the time she signed the MHCPA would be calculated in accordance with that agreement's terms. ECF No. 27- 49 at 128. Langemeier's testimony that the MHCPA's commission-styled payment framework did not apply to her or LOL is self-serving, conclusory, uncorroborated and does not genuinely dispute that a compensation deal based commission-styled payment framework existed in the oil and gas securities scheme at issue. *See Dubois v. Ass'n of Apartment Owners*, 453 F.3d 1175, 1180 (9th Cir. 2006) ("uncorroborated and self-serving declarations ... alone do not create any genuine issues of material fact").

---

[3]    The following evidence supports this theory: the MEA between HR and NV Huskers, under which HR agreed to pay NV Huskers a set-monthly retainer fee of $25,000 in exchange prospective oil and gas project investor introductions at LOL events (ECF No. 27-7); a document tracking what appears to be monthly retainer payments (ECF No. 29-14 at 4); a spreadsheet classifying payments HR submitted to NV Huskers as "Marketing Fees" (ECF No. 27-47 at 2); and testimony that LOL received "marketing fees" and not "fees based on acquisitions or sales" (ECF No. 29-1 at 53).

In addition, it is genuinely undisputed that Langemeier expected to receive transaction-based commissions. The subject line of an email Langemeier sent to Powell, Candace Powell—Powell's RCP-affiliated daughter—Toth, Williams, and Jones reads "My pacing for 290k ... And code 40% to me ... 60% to ISD" ("Langemeier's Email"). ECF No. 27-26 at 2. In Langemeier's Email, seven LOL-clients and their desired investment amounts are listed. *Id.* In his deposition, Jones explained that the subject line of Langemeier's Email related to the commission-based fees she was entitled to under the MHCPA. ECF No. 25-51 at 86, 87. Jones clarified that although the MHCPA contemplated a commission split of 7% to iSD and 3% to LOL, iSD and Langemeier had subsequently agreed to a 6%-iSD and 4%-LOL commission split, the very commission split reflected in the subject-line that Langemeier wrote. *Id.* Langemeier testified that she did not recall what she meant in the email, but a poor memory does not create genuine issue for trial.

Moreover, the uncontroverted record also shows that Defendants received transaction-based commissions for at least some portion of the Relevant Period. First, RCP produced a spreadsheet which tracks LOL-client Michael Connell's $37,500 investment on February 2, 2017, in SEA III—an oil and gas offering. ECF No. 27-45 at 3. In HR's "Master Template – SEA 3 Tracker," a 3% commission of Connell's $37,500 investment, or $1,125, was calculated and listed as being owed to LOL. ECF No. 27-46 at 2. That spreadsheet then incorporates the Connell-derived $1,125 commission into a larger sum total of 3% commissions owed to LOL as of March 14, 2017, totaling $3,112.50. *Id.* The "Homebound Inc. Invoice Listing by Vendor" spreadsheet then tracked all "A/P Invoices" it paid to NV Huskers from January 1, 2017, through July 2, 2018. ECF No. 27-35. On that spreadsheet, HR reported that it paid NV Huskers the larger $3,112.50-sum comprised of the 3% commissions on March 17, 2017. *Id.* at 2. Such evidence clearly indicates that Defendants received transaction-based compensation from HR based on investments made by LOL-clients like Connell and according to the commission-styled terms of the MHCPA. MHC partner-owners corroborated this when they explained that the MHCPA's payment framework was set-up so that "for every investor that came into the offering [] there would be a percentage of the investment amount that would be paid to the source of the contact as a commission[.]" ECF No. 29-3 at 13.

Interestingly, Defendants argue that if they were receiving transaction-based commissions there would be evidence of a $100,000 commission payment to NV Huskers following Bay's $750,000 investment in various oil and gas offerings. Genuine issue is not raised by pointing to "missing evidence" or "missing facts" in the record and, moreover, those "missing facts" are not presumed at summary judgment. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888–89 (1990). While Defendants have introduced evidence that they may have received marketing fees and reimbursement expenses for the portion of the Relevant Period controlled by the MEA, that evidence does not create a genuine issue for trial as to whether they received transaction-based commissions during the portion of the Relevant Period controlled by the MHCPA.

As to the third *Hansen* factor, there is uncontradicted evidence that Defendants previously advised an LOL-client to purchase securities in two different oil and gas projects that pre-date the Relevant Period and that the client in-fact made those purchases. *See* ECF Nos. 27-29, 27-30; *see also* ECF No. 27-49 at 78–96; 27-45 at 2. Next, Defendants have introduced no evidence disputing whether Langemeier was involved in negotiations between client-investors and RCP. Langemeier admitted she spoke to LOL-client Pat Black about investing specific dollar amounts in HBR IV from May of 2016 through July of 2016. ECF No. 27-49 at 80, 97–102. Numerous deponents also testified to email chains and phone calls between RCP-employees and LOL-employees in which LOL agreed to contact and follow-up with potential LOL-client investors on behalf of RCP to finalize investments such as Charlotte Mortimer's investment in SEA III. *See* ECF No. 27-53 at 2; *see also* ECF No. 29-1 at 34–40; ECF No. 27-45 at 2. Most notably, Langemeier's Email instructed Williams of iSD to "do all the paper" to finalize numerous LOL-client investments in SEA III. ECF No. 27-26 at 2. Langemeier's testimony that many of these types of communications with LOL-clients were regurgitated instructions from Powell or Toth (ECF No. 27-49 at 85, 87, 89, 95, 96, 98, 101, 102) does not create genuine dispute as to whether these types of negotiation communications occurred.

As to the fifth *Hansen* factor, Langemeier made valuations as to the merits of certain investments and gave advice to LOL-clients who considered investing. For example, in September of 2017, Langemeier attended a meeting with LOL-client David Bay, Powell, Toth, and others in

Dallas, Texas at the HR offices. ECF No. 29-4 at 10–12. Bay testified that a formal discussion of the investment offering occurred at the meeting and that Langemeier said things to him like "This is why I'm saying this is a good deal. This is a good investment. This is a good use for your -- or investment for your money." *Id*. Bay also testified that sometime after the Texas meeting, he decided to invest in SEA IV and SEA V. *Id*. at 11. Moreover, there are text messages between Langemeier and LOL-client Pat Black pertaining to HBR VI in which Langemeier evaluated the merits of that offering and gave advice to her client about whether he should do the deal. ECF No. 27-49 at 97–102. There is also deposition testimony from Jones that he heard a specific conversation between Langemeier and an LOL-client at the August 2016 Big Table event in which she encouraged the client to invest in HBR VI. ECF No. 29-3 at 18.

As to the sixth *Hansen* factor, Langemeier was an active finder of investors. While the Court notes that the sign-up sheet method of collecting interested clients is passive in nature, there is uncontroverted evidence of Langemeier proactively bringing investors of the oil and gas securities to RCP. A telling example of Langemeier's active investor finding role is an email that an LOL-employee sent an RCP-employee stating, "I was just informed by Loral [Langemeier] that Charlotte [Mortimer] would [sic] to invest in 2 units of SEA III and backdate docs and check… is that still possible? If so, let's coordinate with her and fast track it through ok?" ECF No. 27-53. In this case, Langemeier actively brought Mortimer to RCP and acted to finalize her SEA III investment without effort from RCP. Stokes also testified that it was not uncommon for LOL to relay potential investor names and respective investment amounts to RCP outside of the sign-up sheet method so that those potential investors could be placed in RCP's "pipeline." ECF No. 29-1 at 34–36. Such testimony was corroborated by Jones who testified that it was "regular conversation" during "weekly pipeline calls" for Langemeier to give updates on "people that she knew and was working with from Live Out Loud" who were "looking at investing." ECF No. 29-3 at 17, 18.

After carefully applying the *Hansen* factors to Langemeier's conduct as observed by the record, the Court finds that Defendants acted as brokers in the oil and gas securities scheme at issue. Although Defendants were not employees of an issuer, Defendants (1) expected to receive

and received some transaction-based compensation during the Relevant Period; (2) previously recommended purchase to and the sale of other securities to clients; (3) negotiated with investors on behalf of RCP; (4) made valuations as to the merits of investments and gave advice to invest; and (5) were active rather than passive finders of investors and actively facilitated some transactions. *See SEC v. Thomas*, Case No. 2-19-cv-01515-APG-VCF, 2021 WL 5826279 (D. Nev. Aug. 24, 2021) (concluding defendants acted as brokers for similar *Hansen* factor-based reasons even though defendants were not employees of the issuer). Put alternatively, the totality-of-the-circumstances indicates Defendants engaged in broker-activity throughout key points in the distribution of the oil and gas securities and are subject to Section 15(a)'s registration requirement.

However, Section 15(a)'s broker-registration requirement is subject to certain exemptions. For example, brokers "whose business is exclusively intrastate and who does not make use of any facility of a national securities exchange" are exempt from Section 15(a)'s registration requirement. 15 U.S.C. § 78o(a)(1). In their motion and responsive briefings, Defendants argue that they are exempt from Section 15(a)'s broker-registration requirement under the SEC's no-action *Paul Anka* letter and the SEC's Proposed Finders Exemption Order in its Notice of Proposed Exemptive Order Granting Conditional Exemption from the Broker Registration Requirements of Section 15(a) for Certain Activities of Finders, Exchange Act Release No. 90112 (Oct. 7, 2020) (the "PFEO"). ECF No. 28 at 15–19; ECF No. 35 at 6–8. In opposition, the SEC argues that Defendants are not exempted from registration, that the no-action *Paul Anka* letter and the PFEO do not constitute legal precedent, and that any reliance on them is without merit. ECF No. 27 at 25; ECF No. 36 at 15, 16; ECF No. 38 at 7.

The Court finds that the SEC's no-action *Paul Anka* letter and PFEO do not constitute binding legal authority under which Defendants may claim exemption from Section 15(a)'s broker-registration requirement. First, courts "do not defer to no-action letters" because they are not official agency rulemaking or adjudication. *Roth v. Foris Ventures, LLC*, 86 F.4th 832, 836 (9th Cir. 2023) (citations omitted). Moreover, Defendants' reliance on the PFEO as creating an exemption at this time is misplaced because the PFEO did not exist and was not proposed during Relevant Period in which Defendants' conduct took place, and the PFEO remains un-adopted by

the SEC at this time. Defendants' argument that the PFEO is likely to be adopted if an administration change is observed in the next presidential election (ECF No. 37 at 14, 15) is too attenuated to be persuasive.

Based on the totality-of-the-circumstances, there is no question of material fact that Defendants acted as brokers; they effected transactions in the oil and gas securities for the account of others. As a matter of law then, Defendants are subject to Section 15(a)'s broker-registration requirement. There is similarly no dispute that Defendants were not exempt from broker-registration. Because there is no genuine issue that Defendants' activity was interstate, that Defendants effected or attempted to induce the purchase of the oil and gas securities, and that Defendants were not registered as brokers with the SEC, the Court finds that Defendants violated Section 15(a) of the Exchange Act. Accordingly, the Court grants the SEC's motion for partial summary judgment on its first cause of action and denies Defendants' motion as to the same.

2. <u>There is no genuine issue that Defendants were a necessary participant and substantial factor in the sales of unregistered oil and gas securities through interstate commerce. Therefore, the Court grants the SEC's motion and denies Defendants' motion as to the SEC's second alleged cause of action for Section 5(a) and Section 5(c) violations of the Securities Act.</u>

The SEC seeks summary judgment on its second cause of action that Defendants violated Sections 5(a) and 5(c) of the Securities Act by participating in the offer or sale of securities that were not registered with the SEC for public offering. ECF No. 27 at 2. Defendants also seek summary judgment on this cause of action, arguing that they did not sell or offer to sell the unregistered securities. ECF No. 28 at 2. Sections 5(a) and (c) of the Securities Act make it unlawful for any person, directly or indirectly, to sell or offer to sell a security by any means in interstate commerce unless a registration statement has been filed as to that security or the transaction is exempt from registration. 15 U.S.C. § 77e(a), (c). The securities-registration requirement was designed as "a statutory tool for protecting the public" by placing "the burden on companies issuing securities to inform truthfully the public about themselves and the securities being issued." *S.E.C. v. Platforms Wireless Int'l Corp.*, 617 F.3d 1072, 1085 (9th Cir. 2010) (citations omitted).

///

"To establish a prima facie case for violation of Section 5, the SEC must show that (1) no registration statement was in effect as to the securities; (2) the defendant directly or indirectly sold or offered to sell securities; and (3) the sale or offer was made through interstate commerce." *S.E.C. v. CMKM Diamonds, Inc.*, 729 F.3d 1248, 1255 (9th Cir. 2013) (citations omitted). Scienter is not an element of Section 5 liability. *Id*. at 1256. "Once the SEC introduces evidence that a defendant has violated the registration provisions, the defendant then has the burden of proof in showing entitlement to an exemption." *Id*. at 1255 (citations omitted). Here, the parties do not dispute whether the oil and gas interests were securities or whether a registration statement was filed and in effect with SEC as to the securities. In fact, Defendants admit that the oil and gas securities were "unregistered securities offerings[.]" ECF No. 13 at 2. Nor do the parties dispute that the oil and gas securities sales or offers were made through interstate commerce. Furthermore, Defendants do not claim exemption in their motion or responsive briefings as to the alleged Section 5 violations. The only prima facie element disputed by the parties then is whether Defendants directly or indirectly sold or offered to sell securities.

Section 5 liability is not confined to the person who passes title to the security, *S.E.C. v. Murphy*, 626 F.2d 633, 649 (9th Cir. 1980) ("*Murphy I*"), or the person who initially distributes the security, *S.E.C. v. Phan*, 500 F.3d 895, 902 (9th Cir. 2007) (citation omitted). Instead, courts have developed "participant" liability theory to capture "persons other than sellers who are responsible for the distribution of unregistered securities." *CMKM Diamonds*, 729 F.3d at 1255 (citing and quoting *Murphy I*, 626 F.2d at 649). Under participant liability theory, a defendant's "role in the transaction must be a significant one before liability will attach." *Id*. at 1255 (citing and quoting *Murphy I*, 626 F.2d at 648). A defendant's role in the transaction is significant when he or she is "both a 'necessary participant' and 'substantial factor' in the sales transaction." *Id*. (citing *Phan*, 500 F.3d at 906 (quoting *Murphy I*, 626 F.2d at 648, 652)).

In its motion for partial summary judgment, the SEC argues that Defendants were a substantial factor in the sale of the oil and gas securities and that no exemption to the securities registration requirement applies. ECF No. 27 at 27. Defendants argue that they were not a "necessary participant" or "substantial factor" in the securities transactions but that Powell, Toth,

Jones, and Lee could reasonably be construed as such. ECF No. 28 at 13; ECF No. 35 at 15–17. Langemeier claims that it would be absurd for an educator, who had no hand in creating or distributing the securities offering materials, to be deemed as much as a substantial factor in the securities transactions as Powell, Toth, Jones, and Lee, who were the architects of and had more control over the oil and gas offerings. ECF No. 28 at 13; ECF No. 35 at 16, 17. In rebuttal, the SEC argues that Defendants cannot avoid Section 5 liability on the basis that others had greater involvement in the transactions and reiterates that Section 5's participant liability theory is premised on the conduct of the defendant, not the comparative conduct of others. ECF No. 27 at 14, 15; ECF No. 38 at 11, 12.

"Because Section 5 imposes strict liability for violations of its registration requirement … it is particularly important that the necessary participant and substantial factor test be carefully applied to each case so as not to subject defendants with a de minimis or insubstantial role in a securities scheme to strict liability." *CMKM Diamonds*, 729 F.3d at 1257. A defendant is a necessary participant when the sales transaction would not have taken place but for that defendant's participation. *Murphy I*, 626 F.2d at 651. In addition to being a necessary participant, a defendant "must also be a substantial factor in bringing about the transaction." *CMKM Diamonds*, 729 F.3d at 1255 (citing and quoting *Murphy I*, 626 F.2d at 650 (explaining that a person will not be deemed a seller of securities where they are only a necessary participant in a transaction by way of a mechanical but for act, like a printer who prepares key documents that enable a transaction, because a mechanical but for act is not also a substantial factor in bringing about a transaction))."[W]hether a defendant is a substantial factor in the distribution of unregistered securities is a question of fact requiring a case-by-case analysis of the nature of the securities scheme and the defendant's participation in it. *Id.* at 1258 (citation omitted).

While it is true that not everyone in an unregistered securities transaction is sufficiently involved to be liable for an unlawful distribution, the Court is unpersuaded by Defendants' arguments as to why they are not sufficiently involved here. Defendants offer two primary arguments as to why Langemeier cannot reasonably be construed to have played a significant role in the oil and gas securities transactions. First, Langemeier claims she could not have played a

significant role by virtue of her position as a *bona fide* educator and FEC event host. ECF No. 35 at 8, 14. Second, Langemeier argues that Powell, Toth, Williams, and Jones had more control over the sales transactions than she did and that her participation was incidental to her educational role. ECF No. 35 at 16, 17. As to her first argument, the Ninth Circuit has held that a "participant's title, standing alone, cannot determine liability under Section 5" because title "does not adequately explain what role the defendant actually played in the scheme at issue." *CMKM Diamonds*, 729 F.3d at 1258. Thus, Langemeier's professional title does not explain the role she played in the oil and gas securities scheme at issue. Second, the respective participations of Powell, Toth, Williams, and Jones in the scheme is not at issue in this litigation nor determinative of Langemeier's role in the distribution of the unregistered oil and gas securities. Participant liability is based on "the nature of the securities scheme and the defendant's participation in it." *Id*. (citation omitted). Therefore, Langemeier's participation in the scheme is determinative of whether she is subject to Section 5 liability, not the respective and comparative participation of other individuals.

After carefully reviewing the record, the Court finds that there is no genuine issue that Defendants played a significant role in some of the unregistered oil and gas securities transactions. More specifically, Defendants have failed to produce evidence that disputes whether they were a necessary participant in those transactions. Langemeier was clearly a necessary participant in the transactions because she organized and hosted the Big Table events and Ultimate Millionaire Summit at which invited clients were first introduced to the experts and the oil and gas securities. Put alternatively, but for Langemeier introducing her clients to Powell, Toth, Williams, Jones, and others at LOL-hosted events, her clients would have never purchased unregistered oil and gas securities and the sales transactions would not have occurred. These types of but for acts are undeniably mechanical, much like the printer who prepares key documents for a sales transaction distinguished in *Murphy I*, 626 F.2d at 650. However, Defendants meet the participant liability standard because they also played a substantial factor in the transactions.

Defendants have similarly failed to produce evidence that genuinely disputes whether they were a substantial factor in the sales transactions. There is no question that Defendants carried out quintessential sales activities on behalf of RCP in this scheme. Although she claims it was at the

request of RCP, Langemeier encouraged and advised LOL-clients to purchase and invest in the unregistered securities. Defendants also coached LOL-clients on how to generally complete suitability questionnaires so that they would be found accredited investors for the oil and gas investment projects.[4] In fact, Langemeier admitted that she generally went over suitability questionnaires with clients and specifically confirmed that she would have talked to them about what information they needed to provide to be deemed suitable. ECF No. 29-5 at 55, 56. In addition to coaching clients on how to become accredited investors, Stokes testified that there was "some effort" from LOL to make initial determinations as to whether clients LOL sent to RCP were accredited for the oil and gas investment opportunities. ECF No. 29-1 at 40.

LOL also collected, or facilitated the collection, of personal information for RCP from at least one client who wanted to invest in SEA III during the Relevant Period so that the logistics of his investment could be finalized. *See generally* ECF No. 27-16. Moreover, RCP sent Defendants wiring instructions during the Relevant Period (ECF No. 27-16 at 4) and Defendants admitted that they occasionally provided those wiring instructions to clients (ECF No. 35 at 11). Perhaps the most notable evidence introduced by the SEC showing Langemeier acting as a substantial factor in the sale of the unregistered oil and gas securities is Langemeier's Email. *See* ECF No. 27-26 at 2. Not only did Langemeier's Email contain the names of seven clients and their desired investment amounts, it also instructed Williams of iSD to "do all paper" on the listed investments. *See id.*; *see also* ECF No. 27-49 at 235–38. Even Langemeier's MHC partners knew she was acting as a substantial factor behind the investments listed in the email and engaging in sales activity. Toth replied to Langemeier's Email saying "These kind of emails are not good. We need to be more discrete and some phone conferences probably better. FYI." ECF No. 27-26 at 2.

Defendants argue that to not grant Defendants summary judgment on the alleged Section 5 violations "would send the incomprehensible message that anyone who educates on financial

---

[4] In referencing the suitability questionnaires, LOL-client David Bay testified as to the following: "I do want to say that we were coached at the big table on how to fill these documents out so that we would be accredited"; "Yeah. Again, we were coached to be -- you know, to be able to pass this, I guess is what you would say, or qualify for this, we were being coached"; and "The entire group was coached" by "Loral Langemeier." ECF No. 27-52 at 56, 57, 69, 70.

topics is subject to a Section 5 violation, which can include any Wharton School professor or even the local finance professor down the road from this Court at the University of Nevada." ECF No. 28 at 15. To the contrary, the Court's finding as to Defendants' Section 5 violation only includes the educator or local finance professor who perform quintessential sales activities with investors like those Defendants performed here: communication with clients about investments, encouraging clients to invest, coaching clients on how to complete suitability questionnaires, making preliminary investor accreditation determinations, collecting required personal information from investors that enabled transactions, sending wiring instructions to investors, bringing investors with specific investment amounts to issuers, and instructing issuer-related parties to complete required paperwork to finalize investments that were procured independently and without issuer aid. These undisputed facts reveal that Defendants were a substantial factor in bringing about some transactions in addition to being a necessary participant in those transactions. Because Defendants were both a necessary participant and substantial factor in the transactions, the Court finds that Langemeier and LOL played a significant role in the sale of unregistered oil and gas securities during the Relevant Period.

Based on the record, there is no question of material fact that the oil and gas securities were unregistered, that Defendants directly or indirectly sold or offered to sell the unregistered oil and gas securities, and that the sales or offers to sell were made through interstate commerce. As a matter of law then, Defendants were subject to Sections 5(a) and 5(c)'s securities-registrations requirements. For these reasons, the Court finds that Defendants violated Sections 5(a) and 5(c) of the Securities Act. Accordingly, the Court grants the SEC's motion for partial summary judgment on its second cause of action and denies Defendants' motion as to the same.

       3.    <u>There is no genuine issue that Defendants acted as investment advisers with respect to some clients and failed to disclose material conflicts of interest. Therefore, the Court grants the SEC's motion and denies Defendants' motion as to the SEC's third alleged cause of action for a Section 206(2) Advisers Act violation.</u>

The SEC seeks summary judgment on its third cause of action that Defendants violated Section 206(2) of the Advisers Act by not disclosing material conflicts of interests despite acting as investment advisers to clients. ECF No. 27 at 2. Defendants also seek summary judgment on

this cause of action, arguing that they are not investment advisers and, therefore, owed no fiduciary duties to clients and, as such, were in no position to make material conflict of interest omissions. ECF No. 28 at 25. Sections 206(1) and 206(2) of the Advisers Act make it unlawful for investment advisers to directly or indirectly "employ any device, scheme or artifice to defraud, any client or prospective client" or "engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client[.]" 15 U.S.C. § 80b–6(1), (2). In other words, these sections prohibit investment advisers from "employing a scheme to defraud clients or engaging in practices which operate as a fraud upon clients." *Vernazza v. S.E.C.*, 327 F.3d 851, 858 (9th Cir. 2003). The Advisers Act was enacted "to achieve a high standard of business ethics in the securities industry," *S.E.C. v. Capital Gains Rsch. Bureau, Inc.*, 375 U.S. 180, 186 (1963), by imposing "enforceable fiduciary obligations" on investment advisers. *Transamerica Mortg. Advisors, Inc. v. Lewis*, 444 U.S. 11, 17 (1979) (citation omitted).

District courts in the Ninth Circuit have acknowledged that the fiduciary obligations imposed by Sections 206(1) and 206(2) include disclosing all material facts to clients. *See, e.g.*, *Sec. & Exch. Comm'n v. Sztrom,* 538 F. Supp. 3d 1050, 1056 (S.D. Cal. May 11, 2021) (citing *Capital Gains*, 375 U.S. at 194). In fact, the Supreme Court has held that the "[f]ailure to disclose material facts must be deemed fraud or deceit within [the Advisers Act's] intended meaning[.]" *Capital Gains*, 375 U.S. at 200. In its motion for partial summary judgment, the SEC argues that Defendants acted as unregistered investment advisers who breached their fiduciary duties by advising clients to invest in the oil and gas offerings without disclosing material conflicts of interest. ECF No. 27 at 29, 30. Defendants argue that they are not registered investment advisers and therefore owed no fiduciary duties to clients. ECF No. 28 at 20– 25; ECF No. 35 at 18–21.

To prove a Section 206(1) violation, district courts in the Ninth Circuit require plaintiffs to show that a defendant: (1) was an investment adviser; (2) utilized the mails or instrumentalities of interstate commerce to employ a device, scheme or artifice; (3) the device, scheme or artifice violated a defendant's fiduciary duty to his clients in that he made false and misleading statements or omissions of material fact to his clients; and (4) acted with scienter. *See, e.g.*, *S.E.C. v. Criterion Wealth Mgmt. Servs., Inc.*, 599 F. Supp. 3d 932, 947 (C.D. Cal. Apr. 25, 2022) (citing 15 U.S.C.

§ 80b-6(1), (2)). The same elements are required to prove a Section 206(2) violation—the violation the SEC alleges here—except that scienter is not required and instead "proof of simple negligence" is enough.[5] *See id.*; *see also S.E.C. v. Harrison*, Case No. 8-21-CV-01610-SPG-DFM, 2022 WL 17327325, at *5 (C.D. Cal. Oct. 4, 2022) (citing and quoting *Robare Grp., Ltd. v. SEC*, 922 F.3d 468, 472 (D.C. Cir. 2019)). Of the required prima facie elements, the parties only dispute whether Defendants were fiduciary-owing investment advisers.

Defendants first argue that all cases cited by the SEC in support of its motion on this cause of action involved a registered investment adviser defendant ("RIA") who *per se* constituted a fiduciary. ECF No. 35 at 18. Applied here, Defendants argue that because they are not RIAs, they are not *per se* fiduciaries. ECF No. 35 at 18. While many of the SEC's cited cases do involve RIAs, Defendants fail to cite caselaw demonstrating that only RIAs may be considered investment advisers under the Advisers Act. In fact, Defendant's narrow interpretation of who can be an investment adviser is plainly inconsistent with not only the statutory definition of investment adviser but also the Supreme Court's interpretation of that definition which is "construed like other securities legislation enacted for the purpose of avoiding frauds, not technically and restrictively, but flexibly to effectuate its remedial purposes." *Capital Gains*, 375 U.S. at 195. By definition, an "investment adviser" is "*any person* who, for compensation, engages in the business of advising others, either directly or through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing, or selling securities," 15 U.S.C. § 80b-2(a)(11) (*emphasis* added). The plain language of the statute is clear that "any person" can act as an investment adviser, not just those who are registered.

Importantly, investment advisers are different than brokers. The SEC has stated that brokers "provide transaction-specific recommendations and receive compensation on a transaction-by-transaction basis" such as commissions. Regul. Best Interest: The Broker-Dealer

---

[5] The difference between a Section 206(1) and a Section 206(2) violation is a defendant's requisite mental state. *S.E.C. v. Gendreau & Assocs., Inc.*, Case No. CV-09-3697-JSTFMOx, 2010 WL 11508794, at *5 (C.D. Cal. Dec. 7, 2010) (citing *Vernazza*, 327 F.3d at 860). Section 206(1) requires a defendant to act knowingly or recklessly while Section 206(2) requires a defendant to act negligently. *Id.*

Standard of Conduct, Release No. 86031 (June 5, 2019). By contrast, investment advisers "typically provide ongoing, regular advice and services in the context of broad investment portfolio management, and are compensated based on the value of assets under management or other fee-based arrangements." *Id*. Under federal law, investment advisers owe fiduciary duties to clients whose investments they manage. *Capital Gains*, 375 U.S. at 194. Brokers are subject to a less stringent "best interest" standard of conduct when dealing with clients and making recommendations as to any securities transaction. 17 C.F.R. § 240.15l-1. Under this standard, brokers "must deal fairly with clients and broker transactions in a way that is suitable to those clients' individual traits and needs," but they do not owe express fiduciary duties. *Criterion Wealth*, 599 F. Supp. 3d at 949 (citation omitted).

After careful inspection of the record, the Court finds that Defendants' conduct is the type of conduct encompassed within the "investment adviser" statutory definition. Defendants have failed to produce evidence creating a genuine dispute as to whether they, for compensation, advised clients as to the value of certain securities or as to the advisability of investing in and purchasing certain securities. During the Relevant Period, Langemeier advised clients via text message to make purchases of oil and gas offerings going as far as to say "U will miss this huge one." ECF No. 27-49 at 97–102. Langemeier also encouraged at least one client to invest in an oil and gas offering in person and classified that offering as a "good deal" and a "good use of money" for that client based on her understanding of his portfolio. ECF No. 29-4 at 10–12. After being told this, that client invested in two offerings, SEA IV and SEA V.

At least one district court in the Ninth Circuit has reasoned that when a defendant "discuss[es] or recommend[s] *whether* a client should invest in a private placement," they act as investment advisers. *Criterion Wealth*, 599 F. Supp. 3d at 949. Langemeier has offered no evidence genuinely disputing these interactions and if she discussed or recommended *whether* those clients should invest in specific oil and gas offerings. It is also undisputed by the record that Langemeier was expected to receive compensation and was compensated for her services. Although she is an educator by trade, Langemeier's conduct falls within the broad definition of investment adviser. *See Financial Planning Ass'n v. S.E.C.*, 482 F.3d 481, 484 (D.C. Cir. 2007); *see also Thomas v.*

1   *Metro. Life Ins. Co.*, 631 F.3d 1153, 1164 (10th Cir. 2011) (citing *U.S. v. Elliott*, 62 F.3d 1304,

2   1311 n.8 (11th Cir. 1996) ("[I]f a person receives an economic benefit from a business that includes

3   the giving of investment advice, that person falls within the initial, broad definition of 'investment

4   adviser'"). Thus, the Court finds that Langemeier acted as an investment adviser. [6]

5       Defendants' remaining arguments as to why they should not be considered investment

6   advisers are equally unpersuasive. Defendants claim that they are book authors excluded as a

7   matter of law from the Advisers Act under the publisher exemption found in 15 U.S.C. § 80b-

8   2(a)(11)(D). ECF No. 28 at 22. Defendants appear to abandon this argument in subsequent

9   briefings and opt instead for exemption as teachers under 15 U.S.C. § 80b-2(a)(11)(B). ECF No.

10  35 at 20. Neither exclusion is applicable here. The publisher exclusion is reserved for publishers

11  of "any bona fide newspaper, news magazine or business or financial publication of general and

12  regular circulation[.]" 15 U.S.C. § 80b-2(a)(11)(D). The SEC does not allege that Defendants'

13  published books violated the Advisers Act. Rather, the SEC alleges that Langemeier's client-

14  specific conduct and interactions during the Relevant Period violated the Advisers Act. The

15  publisher exclusion applies when the alleged violation is impersonal communication via

16  publication, not personalized communication with investors. *S.E.C. v. R.G. Reynolds Enterprises,

17  Inc.*, 952 F.2d 1125, 1136 (9th Cir. 1991) ("[t]he exception for publishers applies to 'entirely

18  impersonal' communications and does not exempt [defendant's] personal consultations with

19  investors") (citing and quoting *Lowe v. SEC*, 472 U.S. 181, 210 (1985)). Similarly, the teacher

20  exclusion is reserved for those "whose performance of such services is solely incidental to the

21  practice of his profession." 15 U.S.C. § 80b-2(a)(11)(B). The client-specific services Langemeier

22

23

24      [6]  Of note, Defendants argue that clients could search a free public website and discover that Powell

25  and Toth, not Langemeier, were RIAs that could "properly give investment advice to participants
    outside of LOL events." ECF No. 28 at 21. In her deposition, Langemeier repeatedly claims that

26  when she recommended investments or gave advice to clients outside of LOL-events she was
    simply "regurgitating" information to her clients from Powell and Toth at their instruction. ECF
    No. 27-49 at 85, 87, 89, 95, 96, 98, 101, 102. Essentially, Langemeier admits that she regurgitated

27  recommendations and advice to specific clients at the direction of RIAs who are subject to Section
    206(2)'s material conflict of interest disclosure requirements. Together, these undisputed facts

28  support the Court's finding that Defendants acted as investment advisers here.

provided, and more pointedly her client-specific interactions, are not solely incidental to her profession as an educator. Accordingly, the Court finds neither claimed exclusion applies here.

Finally, Defendants argue that a series of waivers and disclaimers LOL-clients signed makes emphatically clear that they are not investment advisers. ECF No. 28 at 23–25; ECF No. 35 at 19, 20. While such waivers make clear that Defendants never intended to act as investment advisers, they do exempt Defendants from incurring fiduciary duties once they affirmatively engaged in investment adviser conduct. Furthermore, Section 215(a) of the Adviser Act voids "[a]ny condition, stipulation, or provision binding any person to waive compliance with any provision of" the Adviser Act. 15 U.S.C. § 80b-15(a). This is precisely what Defendants attempt here and, as a matter of law, the cited disclaimers and waivers are not evidence genuinely disputing whether Defendants owed fiduciary duties to their clients when they acted as investment advisers.

The remaining issue then is whether Defendants had material conflicts of interest they failed to disclose to their clients. *See Criterion Wealth*, 599 F. Supp. 3d at 948 (explaining the second inquiry district courts make when analyzing whether a defendant has violated section 206(2) to centers on whether defendants had conflicts of interest, had to disclose those conflicts, and did not disclose them). Investment advisers are required to make "full and fair disclosure of all material facts" to their clients as fiduciaries. *Capital Gains*, 375 U.S. at 194 (citation and quotation omitted). Both actual and potential conflicts of interest constitute material facts which require disclosure. *Vernazza*, 327 F.3d at 859 (citation omitted). "Vague disclosures about how an adviser might be deriving additional compensation from their trading activities are inadequate when the adviser is actually doing so and fails to apprise clients of the same. *Criterion Wealth*, 599 F. Supp. 3d at 952 (citations and quotations omitted). The SEC argues that Langemeier failed to disclose conflicts of interest such as her entitlement to receive sales commissions under the MHCPA and her ownership interests. ECF No. 27 at 30. Defendants' only counterargument here is that they were not fiduciaries, so they were not in any position to make material omissions. ECF No. 28 at 35; ECF No. 35 at 20.

It is undisputed that Defendants' entitlement to receive compensation for her clients' investments in the oil and gas securities she recommended to clients constitutes a conflict of

interest. *See Criterion Wealth*, 599 F. Supp. 3d at 952–56 (finding that defendants' failure to disclose their individual entitlements to compensation resulting from brokering activity based on the percentage of their clients' investments in private placements offerings constituted a conflict of interest as to a Section 206(2) charge). It is also undisputed that Defendants failed to disclose their entitlement to compensation as Langemeier admitted that she did not disclose that she was entitled to receive compensation under the MHCPA to her clients because "she didn't see it that way." ECF No. 27-49 at 192, 193. All that remains is whether this conflict of interest was material.

Materiality "depends on the significance the reasonable investor would place on the withheld or misrepresented information .... [a] statement is material if a reasonable investor would have considered it useful or significant." *United States v. Jenkins*, 633 F.3d 788, 802 (9th Cir. 2011). "For a misrepresentation to be material, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." *S.E.C. v. Todd*, 642 F.3d 1207, 1215 (9th Cir. 2011) (citation and quotation omitted). Although materiality is a fact-specific issue "which should ordinarily be left to the trier of fact," *In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1113 (9th Cir. 1989), that is not always the case.

The SEC introduced evidence of a LOL-client and oil and gas securities purchaser David Bay in which he stated that he would have changed his mind about investing in the oil and gas offerings he invested in if he had known that Langemeier was entitled to receive commissions. ECF No. 29-4 at 11–13. The client further described Langemeier's omission as "a huge red flag." *Id*. at 12. As evidenced by his testimony, the client considered the omitted information significant and expressly testified that had he known about it, he would have altered his decision to invest. Defendants have failed to offer any evidence disputing that Langemeier's admitted omission would have significantly altered the total mix of information made available to a reasonable investor. Instead, Langemeier focuses her argument on the fact that she did not have to make the disclosure because she was not a fiduciary, an argument the Court has already dispelled. Therefore, because Langemeier never disclosed her entitlement to receive compensation to her client when her clients invested in the oil and gas securities that she recommended and advised them to invest

in, the Court finds that she violated her fiduciary duty to disclose material conflicts of interest. *See Criterion Wealth*, 599 F. Supp. 3d at 952–56 (finding that defendants' failure to disclose their entitlement to compensation when clients kept investments in private placement offerings constituted a material conflict of interest which defendants failed to adequately disclose).

Based on the record, there is no question of material fact that Defendants acted as investment advisers who failed to disclose material conflicts of interest, specifically their entitlement to compensation when clients invested in the very oil and gas securities that they recommended. It is further undisputed by the record that the exclusions claimed by Defendants do not exempt them from the fiduciary duties that the Advisers Act imparts on investment advisers. For these reasons, the Court finds that Defendants have violated Section 206(2) of the Advisers Act. Accordingly, the Court grants the SEC's motion for partial summary judgment on its third cause of action and denies Defendants' motion as to the same.

**IV.     CONCLUSION**

IT IS THEREFORE ORDERED that Plaintiff SEC's motion for partial summary judgment (ECF No. 27) is **GRANTED** in accordance with this Order: the SEC's motion is GRANTED as it pertains to the alleged securities fraud violations including Section 15(a) of the Exchange Act of 1934, 15 U.S.C. § 78o(a); Sections 5(a) and 5(c) of the Securities Act of 1933, 15 U.S.C. § 77e(a) and 77e(c); and Section 206(2) of the Investment Advisers Act of 1940, 15 U.S.C. § 80(b)–6(2). Summary judgment is not granted as to remedies for the alleged violations. The SEC shall file a separate motion seeking judgment as to remedies.

IT IS FURTHER ORDERED that Defendants Langemeier and LOL's motion for summary judgment (ECF No. 28) is **DENIED**.

The Clerk of the Court is directed to enter partial summary judgment at this time and shall enter final judgment at a future date once the Court determines judgment as to remedies.

IT IS SO ORDERED.

DATED this 16th day of February, 2024.

_____
LARRY R. HICKS
UNITED STATES DISTRICT JUDGE