1
2
3
4
5
6
7
8
9

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff,

v.

LORAL L. LANGEMEIER and LIVE OUT LOUD, INC.,

Defendants.

Case No. 3:22-cv-00269-ART-CSD

ORDER GRANTING IN PART PLAINTIFF'S MOTION FOR FINAL JUDGMENT (ECF No. 46)

10    Plaintiff Securities and Exchange Commission (SEC) brought this action

11  against Defendants Loral L. Langemeier and her company, Live Out Loud, Inc.

12  ("LOL") for securities violations. The Court previously granted the SEC summary

13  judgment on all three claims, finding that Defendants: (1) violated Section 15(a)

14  of the Exchange Act by acting as brokers in the offer and sale of oil and gas

15  securities despite not being registered as brokers with the SEC; (2) violated

16  Sections 5(a) and 5(c) of the Securities Act by participating in the offer and sale

17  of securities that were not registered with the SEC for offering to the public; and

18  (3) violated Section 206(2) of the Advisers Act by acting as investment advisors

19  and failing to disclose material conflicts of interest to their clients. (ECF No. 39.)

20  Before the Court is the SEC's motion for final judgment against Defendants (ECF

21  No. 46). For the following reasons, the Court grants in part and denies in part

22  Plaintiff's motion.

23    **I.    BACKGROUND**

24    This case arises out of the sales of unregistered oil and gas securities from

25  2016 to 2018. (ECF No. 39 at 1.) Langemeier is an author, financial educator,

26  and the founder of LOL, a company that provided financial education services

27  including seminar events. (*Id.*)

28

In April 2016, Langemeier became a partner-owner in Mountain High Capital ("MHC") alongside Thomas Powell, Stefan Toth, Ben Williams, and Lee Jones. (*Id.*) The partnership's stated objective was to provide alternative investment education and opportunities to a diverse group of clients. (*Id.*) Powell was the founder and manager of Resolute Capital Partners, a private equity group that raised funding for oil and gas projects; Toth was the CEO of Homebound Resources, a Texas company involved in the production, development, and management of oil and gas projects; and Williams and Jones were the operating managers for iSelf-Direct (iSD), a company that helped investors open retirement accounts which they could use to purchase securities in the oil and gas projects managed by Homebound Resources and funded by Resolute Capital Partners. (*Id.* at 2-3.) Langemeier was to be the primary source of prospective investor lead generation via her LOL client base. (*Id.* at 3.)

Langemeier and LOL received payments during the relevant period under two agreements. Under the Mountain High Capital Partnership Agreement ("MHCPA"), MHC partner-owners were compensated when they brought an investor to the project. (*Id.*) The originating source of an investor would earn up to a 10 percent fee. (*Id.*) When an investor originated with Langemeier or LOL and then used iSD's services to open an account, LOL would receive 3 percent and iSD would receive 7 percent. (*Id.*) In 2018, Langemeier and Toth executed a Marketing Engagement Agreement ("MEA") under which HR agree to pay NV Huskers (a business entity that received payments on behalf of Langemeier and LOL) a monthly retainer fee of $25,000 in exchange for prospective oil and gas project investor introductions at LOL events. (*Id.*)

From 2016 to 2018, Langemeier invited Powell, Toth, Williams, Lee, and others to present on oil and gas investment at LOL's educational seminar "Big Table" events and the one-time "Ultimate Millionaire Summit." (*Id.*) If an attendee wanted to learn more, they provided their information on a sign-up sheet which

was forwarded to the presenter. (*Id.*) Through this process, many LOL clients purchased oil and gas securities offered by the presenters. (*Id.* at 4.)

After conducting an internal investigation, the SEC recommended filing an enforcement action against Langemeier and LOL for their involvement in this oil and gas securities scheme. (*Id.*) Defendants denied involvement. (*Id.*) In June 2022, the SEC filed a civil complaint against Defendants. (*Id.*) Powell, Toth, Resolute Capital Partners, Homebound Resources, and Williams reached settlements with the SEC in which they admitted to various securities violations. (*Id.*)

In its order on summary judgment, the Court found that Defendants violated Section 15(a) of the Exchange Act, Sections 5(a) and 5(c) of the Securities Act, and Section 206(2) of the Advisers Act. (ECF No. 39.) First, Defendants acted as brokers of the oil and gas securities transactions to LOL clients, receiving transaction-based compensation under the MHCPA, and were therefore subject to Section 15(a)'s broker-registration requirement. Because they were not registered as brokers with the SEC, Defendants violated Section 15(a) of the Exchange Act. (*Id.* at 7–15.) Second, Defendants played a significant role in some of the unregistered oil and gas securities transactions at issue because it was at Langemeier's events that clients were first introduced to Powell, Toth, Williams, Jones, and others. (*Id.* at 15–20.) As such, Defendants violated Sections 5(a) and 5(c) of the Securities Act by selling or offering to sell unregistered securities. (*Id.*) Third, Defendants acted as investment advisors—for example, by advising clients via text message to make purchases of oil and gas securities—and failed to disclose conflicts of interest such as their entitlement to receive compensation when clients invested in those oil and gas securities. As such, they violated Section 206(2) of the Advisers Act. (*Id.* at 20–27.)

After granting the SEC's motion for summary judgment, the Court ordered the SEC to file a motion seeking judgment as to remedies.

1

## II.    DISCUSSION

In its motion for judgment, the SEC requests that the Court: (A) issue a permanent injunction enjoining Defendants from violating Section 15(a) of the Exchange Act; Sections 5(a) and 5(c) of the Securities Act; and Section 206(2) of the Investment Advisors Act; (B) order a conduct-based injunction enjoining Langemeier from participating in the issuance, purchase, offer, or sale of any security, except that she not be prevented from purchasing or selling securities for her own account; (C) order Langemeier to disgorge ill-gotten gains in the amount of $684,661 plus prejudgment interest in the amount of $205,162; and (D) order each Defendant to pay a civil penalty of $100,000. The Court addresses each requested remedy in turn.

### A. Permanent Injunction

The SEC requests that the Court issue a permanent injunction. (ECF No. 46 at 13–15.) Defendants do not object. (ECF No. 50 at 11.)

To obtain a permanent injunction, the SEC must establish that there is a reasonable likelihood of future violations of securities laws. *S.E.C. v. Murphy*, 626 F.2d 633, 655 (9th Cir. 1980). "The existence of past violations may give rise to an inference that there will be future violations; and the fact that the defendant is currently complying with the securities laws does not preclude an injunction." *Id.* "In predicting the likelihood of future violations, a court must assess the totality of the circumstances" and consider factors such as "the degree of scienter involved; the isolated or recurrent nature of the infraction; the defendant's recognition of the wrongful nature of his conduct; the likelihood, because of defendant's professional occupation, that future violations might occur; and the sincerity of his assurances against future violations." *Id.*

Here, the SEC has shown that there is a reasonable likelihood of future violations of securities laws. Although none of the violations required a finding of scienter, other factors weigh in favor of an injunction. First, the violations were

4

recurrent over a three-year period and came after Langemeier settled with South Carolina over previous alleged securities law violations. (ECF Nos. 27-31; 27-49.) Second, Langemeier does not appear to recognize the wrongful nature of her conduct. In her declaration, she states that she regrets signing the MHCPA and relying on Powell's expertise but does not explicitly acknowledge the wrongful nature of her own actions. (ECF No. 50-2 at 3.) Third, Langemeier states that she has no intention of violating any securities laws in the future, that she has retained experienced securities counsel to advise on future agreements, and that she has implemented a new code of conduct. (*Id.* at 4.) While these actions may decrease the likelihood of future violations, Langemeier's occupation tends to suggest a risk of future violations. Langemeier admits that she continues to run the same business under a new trade name, "Integrated Wealth Systems." (ECF No. 27-49 at 18.) Taken together, these factors suggest that, absent an injunction, Langemeier may make similar errors in the future. The Court therefore grants the SEC's request for a permanent injunction.

### B. Conduct-Based Injunction

The SEC requests that the Court issue "[a] conduct-based injunction that permanently restrains and enjoins Langemeier from, directly or indirectly, including but not limited to, through any entity she owns or controls, participating in the issuance, purchase, offer, or sale of any security, provided, however, that she not be prevented from purchasing or selling securities for her own account." (ECF No. 46.) Defendants object, arguing that the *Murphy* factors do not support an injunction of this breadth.

The Court has broad discretion to fashion "any equitable relief that may be appropriate or necessary for the benefit of investors." 15 U.S.C. § 78u(d)(5). There is "[n]o per se rule requiring the issuance of an injunction upon the showing of past violation" and the district court has a "significant degree of

latitude" in determining whether there is a reasonable likelihood that the wrong be repeated. *S.E.C. v. Koracorp Indus., Inc.*, 575 F.2d 692, 701 (9th Cir. 1978).

The SEC has not explained why a conduct-based injunction is necessary in addition to a permanent injunction. This case is distinguishable from other cases in which the defendant's conduct was more culpable or involved repeat violations. *See United States Sec. & Exch. Comm'n v. Wellness Matrix Grp., Inc.*, 2023 WL 5235177, at *7 (C.D. Cal. Aug. 10, 2023) (issuing a conduct-based injunction in addition to a permanent injunction where the defendant acted with a high degree of scienter and violated a prior permanent injunction); *Sec. & Exch. Comm'n v. Nguyen*, No. 8:19-CV-01174-SVW-KES, 2024 WL 3381583, at *3 (C.D. Cal. Feb. 23, 2024) (issuing a conduct-based injunction where defendant acted with a high degree of scienter and his conduct was recurrent over an extended period of time). The lack of evidence supporting scienter or repeat violations in this case suggests that a conduct-based injunction is not necessary.

The Court therefore denies the SEC's request for a conduct-based injunction.

## C. Disgorgement

The SEC requests that the Court order Langemeier to pay disgorgement of $684,661 with prejudgment interest of $205,162. (ECF No. 46 at 15–18.)

"A district court has broad equity powers to order the disgorgement of ill-gotten gains obtained through the violation of the securities laws. Disgorgement is designed to deprive a wrongdoer of unjust enrichment, and to deter others from violating securities laws by making violations unprofitable." *SEC v. Platforms Wireless Int'l Corp.*, 617 F.3d 1072, 1096 (9th Cir. 2010) (citation omitted).

"Disgorgement need be 'only a reasonable approximation of profits causally connected to the violation.'" *Id.* The SEC "bears the ultimate burden of persuasion that its disgorgement figure reasonably approximates the amount of

unjust enrichment." *Id.* But once the SEC establishes a reasonable approximation of defendants' actual profits, the burden shifts to the defendants to demonstrate that the disgorgement figure was not a reasonable approximation. *Id.* "Courts may not enter disgorgement awards that exceed the gains made upon any business or investment, when both the receipts and payments are taken into account." *Liu v. Sec. & Exch. Comm'n*, 591 U.S. 71, 91 (2020). "Accordingly, courts must deduct legitimate expenses before ordering disgorgement under 78u(d)(5)." *Id.* at 91–92.

The SEC first argues that Langemeier received $404,807 in transaction-based compensation under the MHCPA and MEA. (ECF No. 46 at 15–18.) Langemeier admitted during depositions that she received $404,807 from Homebound into NV Huskers. (ECF No. 27-50 at 22.) An invoice from Homebound confirms this sum. (ECF No. 27-35 at 2.) Defendants argue that disgorgement should be limited to $3,112.50, pointing to the Court's prior order on summary judgment. But that argument misinterprets this Court's prior order, which mentioned that figure only as an example to illustrate how Defendants' sales commissions were calculated. (ECF No. 39 at 11.) The Court finds that $404,807 is a reasonable approximation of Defendants' profits causally connected to the violation.

The SEC next points to Langemeier's admission that she received approximately $279,854 when MHC dissolved. (ECF No. 27-49 at 134.) Defendants admit that Langemeier received this amount as a liquidating distribution upon MHC's dissolution but argue that that this amount "should not be considered as ill-gotten gains from any attenuated securities sale transaction[s]" because the only problematic provision of the MHCPA was the "iSD-70%/LOL-30% Split Provision payments." (ECF No. 50 at 9.) Defendants do not explain to what extent—if any—Langemeier and LOL were involved in the MHCPA except to receive the unlawful transaction-based commissions at issue

in this case. However, the SEC also has failed to sufficiently explain how this dissolution payment was causally connected to the securities law violations at issue in this case.

The Court therefore finds that $404,807 is a reasonable approximation of profits causally connected to the violations but declines to add the requested $279,854. The Court is unable to subtract legitimate expenses from this figure because Defendants have failed to establish any legitimate expenses. In her declaration, Langemeier explains that "[t]o offset the extraordinary costs of hosting LOL events, LOL traditionally receives reimbursements from expert speakers attending such events to offset associated travel, facility and marketing expenses." (ECF No. 50-2 at 3.) But during deposition, Langemeier admitted that she did not track expenses and that all payments received under the MEA were classified as "marketing fees" or "revenues." (ECF No. 27-50 at 30–36.) Langemeier has failed to provide evidence of any travel, facility and marketing expenses or receipts. The Court therefore finds that there are no legitimate expenses to deduct. *See U.S. Sec. & Exch. Comm'n v. Yang*, 2022 WL 3278995, at *1 (9th Cir. Aug. 11, 2022) (finding that district court did not err in holding that defendants were not permitted to deduct expenses because those expenses were "illegitimate"). Thus, Langemeier is liable for the entire amount of the funds that she received in transaction-based compensation through the MEA and MHCPA.

The Court also finds that prejudgment interest calculated at the IRS underpayment rate is appropriate. *See S.E.C. v. Platforms Wireless Int'l Corp.*, 617 F.3d 1072, 1099 (9th Cir. 2010) (upholding a district court's calculation of prejudgment interest based on the tax-underpayment rate provided for in 26 U.S.C. § 6621). Because the SEC's calculation is based on a larger sum than the Court finds appropriate for disgorgement, the Court orders the SEC to file an

updated calculation of its request for prejudgment interest consistent with this order.

The Court therefore grants the SEC's request for disgorgement in the amount of $404,807 plus prejudgment interest in an amount to be determined.

### D. Civil Penalties

The SEC seeks civil penalties in the amount of $100,000 for both LOL and Langemeier. Defendants contend that civil penalties are not warranted.

Civil penalties are designed to deter the wrongdoer from similar violations in the future. *Murphy*, 50 F.4th at 847. The SEC can seek to impose three tiers of penalties. 15 U.S.C. §§ 77t(d)(2), 78u(d)(3)(B), and 80b-9. Penalties are "determined by the court in light of the facts and circumstances." *Id.* First-tier penalties may be imposed for any violation of any of the Acts and are "determined by the court in light of the facts and circumstances." *Id.* §§ 77t(d)(2)(A), 78u(d)(3)(B)(i). If the penalty is first tier, "for each violation, the amount of the penalty shall not exceed the greater of (i) $5,000 for a natural person or $50,000 for any other person, or (ii) the gross amount of pecuniary gain to such defendant as a result of the violation." *Id.* Second-tier penalties apply to violations that "involved fraud, deceit, manipulation or deliberate or reckless disregard of a regulatory requirement." *Id.* §§ 77t(d)(2)(B), 78u(d)(3)(B)(ii). "[T]he amount of penalty for each such violation shall not exceed the greater of (i) $50,000 for a natural person or $250,000 for any other person, or (ii) the gross amount of pecuniary gain to such defendant as a result of the violation." *Id.* Courts routinely consider the *Murphy* factors when assessing civil penalties. *Sec. & Exch. Comm'n v. CMKM Diamonds, Inc.*, 635 F. Supp. 2d 1185, 1192 (D. Nev. 2009).

The Court finds that Langemeier is liable for first-tier penalties. Although she violated multiple provisions of the securities laws over several years, the SEC has not shown that she acted with "fraud, deceit, manipulation, or deliberate or

reckless disregard." None of the three violations required a finding of scienter. The SEC also has not explained why the Court should issue penalties against both Langemeier and LOL when they admit that Langemeier personally received the entire proceeds from Defendants' illegal conduct. (ECF No. 46 at 2.)

The SEC also has not set out what should constitute a "violation" and has not explained how many individuals were affected by Langemeier's actions. The Court therefore cannot meaningfully compare the defendants' violations to other cases. *See SEC v. CMKM Diamonds, Inc.*, 635 F. Supp. 2d 1185, 1192 (D. Nev. 2009) (declining to multiply the defendant's violations by a dollar amount because of the difficulty in determining the number of violations). Although in no way determinative, the Court can consider settlements that the SEC reached with other MHCPA partners. Williams, whose role in the scheme appears to have been most comparable to Langemeier's, received a civil penalty of $50,000. *In the Matter of Benjamin D. Williams, Respondent.*, Release No. 5948 (Jan. 21, 2022).

For a first-tier violation, the Court may impose a penalty between $5,000 and Langemeir's gross pecuniary gain ($404,807). Based on consideration of the same *Murphy* factors analyzed above—Langemeier's lack of scienter, the recurrent nature of the violations over three years, Langemeier's failure to recognize the wrongful nature of her conduct, and her professional occupation— the Court finds that a penalty of $50,000 is appropriate.

### III.    CONCLUSION

The Court therefore orders that Plaintiff SEC's motion for final judgment (ECF No. 46) is granted in part and denied in part. The Court finds that the following remedies are appropriate: a permanent injunction; disgorgement in the amount of $404,807 plus prejudgment interest in an amount to be determined; and civil penalties in the amount of $50,000.

The Court orders that the SEC provide an updated calculation of prejudgment interest consistent with this order by Wednesday, March 19, 2025.

The Court will issue an order of final judgment after the SEC files an updated calculation of its request for prejudgment interest.

DATED: March 4, 2025

_____
ANNE R. TRAUM
UNITED STATES DISTRICT JUDGE